# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### MARCH SESSION, 1999

**FILED**

April 30, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 01C01-9801-CR-00015** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **DAVIDSON COUNTY** |
| **VS.** | ) | |
| | ) | **HON. FRANK G. CLEMENT, JR.** |
| **ROY A. JORDAN,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (Vehicular Homicide) |

## ON APPEAL FROM THE JUDGMENT OF THE
## CRIMINAL COURT OF DAVIDSON COUNTY

FOR THE APPELLANT:

JAMES ROBIN MCKINNY, JR.
One Washington Square
Suite 103
214 Second Avenue North
Nashville, TN 37201

TOMMY TRAVIS OVERTON
213 Third Avenue North
Nashville, TN 37201

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

ELIZABETH B. MARNEY
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243

VICTOR S. JOHNSON
District Attorney General

BERNARD MCEVOY
Assistant District Attorney General
Washington Square, Suite 500
222 Second Avenue North
Nashville, TN 37201-1649

OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# OPINION

The Defendant, Roy A. Jordan, was found guilty of vehicular homicide and sentenced to ten years. He now appeals his conviction, pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. The Defendant presents two issues on appeal: (1) whether the evidence was sufficient to support the jury's finding of guilt beyond a reasonable doubt; and (2) whether the trial court properly denied his motion to suppress the results of his blood alcohol test.

On October 25, 1996 at approximately ten o'clock p.m., Mr. and Mrs. Bill Stone exited the Darkhorse Theatre on Charlotte Avenue after viewing a play. Mr. Bong Im, who was traveling westward on Charlotte in an Oldsmobile Cutlass, stopped his vehicle in front of the theatre to allow theatregoers to cross Charlotte. He signaled a group, which included the Stones, to cross the street in front of his vehicle where there was no crosswalk. The first two individuals in the group crossed Charlotte safely. However, as two more individuals, the Stones, attempted to make their way across the street, the Defendant's Chevrolet Blazer, which was also traveling westward on Charlotte, rear-ended Mr. Im's car. Mr. Im's vehicle lurched forward, striking Mr. Stone and throwing his body over the hood of the car into the next intersection. Stone died at the scene. After hitting Mr. Im's car, the Blazer veered to the left and struck an oncoming car.

One eyewitness, Steven Carl Scalet, testified that he was alerted to the impending accident by the "sound of a car or truck coming too fast, just revving up his engine." He reported that the Blazer was traveling at a speed in excess

of forty-five or fifty miles per hour. Scalet stated that between the time he looked up and first saw the Defendant's Blazer approaching, he had enough time to think, "If he starts to stop right now, he will avoid an accident. And even—you know, like half a second to a second later, . . . you still have another chance; stop right now and you will not hit this parked car." He also testified that the Blazer did not "break up until the very last millisecond or a second and a half" before hitting Im's car. Scalet stated that after the accident, he watched the Defendant exit the Blazer and noticed that the Defendant "looked like he had been drinking."

Another eyewitness to the accident, Malika Jackson, testified that the Defendant's Blazer was traveling at approximately sixty miles per hour. She estimated that five seconds passed between the time that she first noticed the Blazer speeding down the street and the time of collision. She stated that Mr. Im's car was completely stopped at the time of the crash.

A third eyewitness to the collision and a close friend of the victim, Orville D. Hinkle, testified that he attended the play with the victim on the night of the accident and stated that he and his family crossed Charlotte shortly before the Stones. Hinkle reported that the portion of Charlotte where the accident occurred was well-lit at the time of the crash, illuminated by both street lights and lights from a church. He also maintained that Mr. Im's car was at a complete stop at the time of the crash. He recalled that after the crash, he ran by the Defendant's vehicle and observed the Defendant sitting with his head in his hands. He stated that he noticed the "smell of alcohol" as he ran by.

Evans Donnell, a fourth eyewitness to the accident, testified that the Blazer was traveling at a speed over forty-five miles per hour before hitting Mr. Im's stopped car. Like Mr. Hinkle, he reported that Charlotte Avenue was well-lit at the time of the accident and that although it began to rain shortly after the accident, it was not raining at the time of the accident. In addition, he testified that there were no other cars in the vicinity of the Blazer before the crash. He testified that as the Blazer approached Mr. Im's car, he wondered whether it would stop in time and stated that he believed the Blazer could have stopped in time. He further testified that after he watched the Blazer hit Mr. Im's car, he heard the Blazer's engine "revving" before the Blazer crashed into the oncoming car. He recalled that after the accident, he heard the Defendant ask, "What happened?" and testified that the Defendant, who "appeared quite disheveled," smelled of beer.

Officer Scott Mitchell was called to the scene shortly after the accident. He testified that when he approached the Defendant, the Defendant informed him that his Blazer had been hit in the rear by another car, causing him to "swerve into the oncoming traffic and strike another vehicle." He stated that the Defendant did not mention anything at that time about striking Mr. Im's car. Mitchell testified that he "detected a strong odor of alcohol about [the Defendant]." He stated that the Defendant's "eyes were bloodshot and red, his speech was slurred and he seemed somewhat confused when answering . . . questions. He was unstable on his feet also." According to Mitchell, the Defendant admitted to having drunk four beers before the accident. He testified that he also checked the inside of the Defendant's vehicle and found "close to 30" beer cans, some full and some empty.

Officer Ronald C. Swanson, a member of the DUI Enforcement Unit, administered field sobriety tests to the Defendant at the scene of the accident. When he arrived, he escorted the Defendant to a level surface "away from the distraction of the noise and lights" to administer the tests. Swanson observed that the Defendant could not walk unaided, that there was an extremely "strong odor of alcohol" about the Defendant, and that the Defendant's speech was slurred and "mumbling." He concluded that the Defendant "was about as intoxicated as anybody [he'd] ever seen." Swanson testified that when he administered the horizontal gaze nystagmus test to the Defendant, the Defendant was initially able to follow his instructions but then "kind of discontinued and sort of gazed." The Defendant subsequently declined to perform the nine-step walk-and-turn and the one-leg-stand tests.

Swanson stated that he then seated the Defendant in the patrol car, where the Defendant began to make incoherent comments, and recited to the Defendant his Miranda rights. He recalled that the Defendant made a couple of comments about wanting to see a lawyer. Swanson next transported the Defendant to Nashville General Hospital, where a sample of the Defendant's blood was drawn at midnight. Jerry Gowen, the director of the clinical laboratory at the hospital, testified that hospital policy ordinarily requires consent of the patient for obtaining blood samples, except when the patient is under arrest. Test results revealed that at midnight, the Defendant's blood contained an alcohol content of .20 percent.

Officer Joe Morton testified about damage done to the vehicles during the accident. He stated that he examined the Defendant's vehicle and was unable

to find any damage to its rear or any other evidence indicating that it had been struck from behind. He also testified that there were numerous beer cans inside the Blazer and a glass bowl containing two full beer cans, which was positioned on the floorboard of the driver's side within reach of the driver. He determined that Mr. Im's vehicle traveled 158 feet after the collision and that the distance between the area of impact and the intersection of 46th Street, the approximate location where eyewitnesses first noticed the speeding Blazer, was 331 feet. He stated that a driver of a vehicle going forty miles per hour, the designated speed limit on Charlotte Avenue, would have a little over five seconds to react to another car stopped approximately three hundred feet ahead of his car.

In addition, Morton testified that he contacted the Defendant at the hospital shortly after midnight. He stated that at that time, the Defendant still smelled strongly of alcohol, his speech was slurred and disjointed, and his eyes were watery. He concluded that "he was unable to drive, he was impaired." He stated that the Defendant told him that as he changed lanes to pass a car, he saw Mr. Im's car stopped ahead, but was unable to stop his own vehicle in time.

The Defendant testified at trial. He stated that at 4:00 p.m. on October 25, 1996, he picked up a six-pack of beer after work and drank it before 5:00 p.m., when he went to his second job. He reported that at approximately 9:15 p.m., he left his second job to meet a friend, Robert McCarter, who was employed as security for a church on Charlotte Avenue. McCarter, whom the Defendant sometimes helped out free of charge, was paid to sit inside his own vehicle in the church parking lot during church services to prevent theft and vandalism. According to the Defendant, he arrived at the church at approximately 9:30 p.m.

-6-

and opened another can of beer. He stated that between the time he got off work at 9:15 and the time he left the church, he drank another three and one-half beers. He and Mr. Im, who was also employed at the church, left the church at approximately the same time.

> The Defendant testified,
>
> We were traveling westbound on Charlotte; I was next to the center lane on Charlotte Avenue. We got to 46th Avenue and the car in front of me, which had just left the church, applied his brakes. I changed lanes because I did not see any brake lights on the back of Mr. Im's car at that time. When I changed lanes his lights came on and I applied my brakes and that's when I slid.[1]

He claimed that he was traveling at a speed of forty miles per hour before applying his brakes and also claimed that the streetlights in front of the Darkhorse Theatre were not working. He testified that even if he had been sober, he would have hit Mr. Im's car. He stated, "I had no indication that the gentleman was stopped where he was until after I changed lanes and I saw his brake lights being applied then." In addition, he denied telling Officer Mitchell at the scene of the crime that he had been rear-ended.

The Defendant maintained that he did not consume any beer inside his vehicle after leaving the church. He further testified that he felt the effects of alcohol more strongly at the time his blood was drawn after the accident than at the time of the accident. Finally, he admitted to having drunk a six-pack of beer almost every day for six years during the time between his first and second jobs.

---

[1] No witness to the accident saw the Defendant change lanes before crashing into Mr. Im's car.

Robert McCarter, the Defendant's friend, testified that the Defendant arrived at the church parking lot at approximately 9:15 or 9:20 p.m. on the night of the accident. He testified that the Defendant had a can of beer in his hand and that his breath smelled strongly of alcohol. However, he stated that the Defendant "seemed to have knowledge and his speech wasn't slurred."

Donna Jordan, the Defendant's wife, stated that she saw her husband with a beer in his hand at approximately 9:15 or 9:20 on the night of the accident when he stopped by their home before heading to the church. She testified that she knew he had been drinking because of his demeanor and the fact that his eyes were bloodshot. However, she also stated, "He was talking all right, he was walking fine . . . [and] he didn't stagger."

## I. SUFFICIENCY OF THE EVIDENCE

The Defendant first argues that the evidence presented at trial is insufficient to sustain his conviction for vehicular homicide. He theorizes that if Mr. Im had testified, the jury could have determined that Mr. Im contributed to the accident. He contends that a "rational trier of fact could have found that the essential element for the crime was not proven beyond a reasonable doubt due to the lack of testimony from Mr. Im." He emphasizes the fact that the Defendant did not submit to a breath alcohol test. He also points out Officer Swanson's notation in his report that he was unable to ascertain the Defendant's "ability to operate a motor vehicle."

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the

evidence is insufficient to support the finding by the trier of fact beyond a reasonable doubt." Tenn. R. App. P. 13(e). In addition, because a conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914 (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191 (citing Cabbage, 571 S.W.2d at 836). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. Tuggle, 639 S.W.2d at 914.

Based upon our review of the record, we conclude that there was clearly sufficient evidence introduced at trial to support the jury's verdict. The Defendant complains that Mr. Im was not called as a witness at trial and contends that Mr. Im's testimony would have convinced jurors that Mr. Im contributed to the accident. However, the Defendant does not specify what testimony Mr. Im could have provided to ensure this result. We note that the Defendant could have called Mr. Im as a witness and apparently chose not to do so. We may not now

hypothesize about what testimony Mr. Im may or may not have provided. <u>See</u> Tenn. R. App. P. 13(c).

Our vehicular homicide statute, Tennessee Code Annotated § 39-13-213, defines the crime as "the reckless killing of another by the operation of an automobile, airplane, motorboat, or other motor vehicle . . . [a]s the proximate result of the driver's intoxication as set forth in § 55-10-401 . . . ." Tenn. Code Ann. § 39-13-213(a)(2). Tennessee Code Annotated § 55-10-401 specifies that an individual is intoxicated for purposes of our DUI statute if his or her blood alcohol content is "ten-hundredths of one percent (.10%) or more." <u>Id.</u> § 55-10-401(a)(2).

Tests performed on a sample of the Defendant's blood which was drawn approximately two hours after the accident reveal that the Defendant's blood alcohol content was .20 percent, twice the amount required by statute to show intoxication. The Defendant himself admitted to drinking nine and one-half beers on the evening of the accident, three and one-half of them within less than an hour before the crash. Moreover, numerous witnesses and officers present at the scene of the accident described the Defendant as inebriated and smelling strongly of alcohol. Thus, it is clear that the proof demonstrated that the Defendant was intoxicated at the time of the accident.

Furthermore, witnesses to the accident testified that the Defendant was speeding; that Mr. Im's car stopped substantially ahead of the Defendant's speeding vehicle; that Mr. Im's car was completely stopped at the time of the crash; that there were no other cars on the road to impede the Defendant's view;

that the Defendant did not apply his brakes until the very last moment before he hit Mr. Im's car; and that the Defendant accelerated after striking Mr. Im's car, thus propelling his own vehicle into an oncoming car. Certainly this is sufficient evidence from which a rational trier of fact could conclude that the Defendant's recklessness was the cause of the accident and that the accident was the proximate result of his intoxication. This issue is without merit.

## II. BLOOD ALCOHOL TEST

The Defendant next argues that the results of his blood alcohol test should have been excluded from evidence.[2] He challenges the constitutionality of Tennessee Code Annotated § 55-10-406(e) on the basis that it compels a defendant to give evidence against himself, in contravention of Article I, Section 9 of our state constitution. Tenn. Const. art. I, § 9.[3] He also contends that the statute violates rights protected by Article I, Section 7 of our state constitution,[4] arguing that "the least obtrusive measure [by] which to compel a Defendant to provide a blood alcohol sample is to ascertain a search warrant to ensure that the constitutional safeguards are met and satisfied." Tenn. Const. art. I, § 7.

---

[2] In his brief, the Defendant initially argues that the "results of the breath alcohol test should have been excluded from evidence." (Emphasis added.) However, from a reading of his argument as a whole, it seems clear that the Defendant is referring to the blood alcohol test results.

[3] The relevant portion of Article I, Section 9 of the Tennessee Constitution, "the accused . . . shall not be compelled to give evidence against himself," parallels the Fifth Amendment to our United States Constitution, which provides, in pertinent part, "[n]o person shall . . . be compelled in any criminal case to be a witness against himself." Tenn. Const. art. I, § 9; U.S. Const. amend. V.

[4] Both Article I, Section VII of the Tennessee Constitution and the Fourth Amendment to the United States Constitution address unreasonable searches and seizures. Tenn. Const. art. I, § 7; U.S. Const. amend. IV.

In Tennessee, anyone who operates a motor vehicle on the roads of our state is "deemed to have given consent to a test for the purpose of determining the alcoholic . . . content of that person's blood . . . ." Tenn. Code Ann. § 55-10-406(a)(1). If an accused is charged with driving under the influence and "refuses to submit" to testing, the tests "shall not be given." Id. § 55-10-406(a)(3). However, when a person is charged with vehicular homicide, Tennessee Code Annotated § 55-10-406(e) applies. It provides:

> Nothing in this section shall affect the admissibility in evidence, in criminal prosecutions for aggravated assault or homicide by the use of a motor vehicle only, of any chemical analysis of the alcoholic or drug content of the defendant's blood which has been obtained by any means lawful without regard to the provisions of this section.

Id. § 55-10-406(e).

In Schmerber v. California, 384 U.S. 757 (1966), the United States Supreme Court emphasized that the Fifth Amendment privilege against self-incrimination under our United States Constitution "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." Id. at 761. The Court determined that

> [t]he values protected by the Fourth Amendment . . . substantially overlap those [that] the Fifth Amendment helps to protect. History and precedent have required that we today reject the claim that the Self-Incrimination Clause of the Fifth Amendment requires the human body in all circumstances to be held inviolate against state expeditions seeking evidence of crime. But if compulsory administration of a blood test does not implicate the Fifth Amendment, it plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment.

Id. at 767. The Court concluded that blood test evidence is admissible if the test is performed in a reasonable manner and there is some indication that the

evidence sought will be found. Id. at 771; see also State v. Greene, 929 S.W.2d 376, 380 (Tenn. Crim. App. 1995).

In State v. Cleo Mason, No. 02C01-9310-CC-00233, 1996 WL 111200 (Tenn. Crim. App., Jackson, March 14, 1996), the late Judge Joe B. Jones wrote for this Court and adopted the Schmerber test, which sets forth four prerequisites to be met before the results of a compelled blood-alcohol test are admissible into evidence. The State must prove by a preponderance of the evidence that:

> a) The officer compelling the extraction of blood from the accused has probable cause to believe that the accused committed the offense of aggravated assault or vehicular homicide while under the influences of an intoxicant or drug, and there is a clear indication that evidence of the accused's intoxication will be found if the blood is taken from the accused's body and tested;
> b) Exigent circumstances exist to forego the warrant requirement;
> c) The test selected by the officer is reasonable and competent for determining blood-alcohol content; and
> d) The test is performed in a reasonable manner.

Id. at *7-8 (citations omitted) (citing Schmerber, 384 U.S. at 768-72). In Mason, this Court ruled that on the specific facts of the case, the use of physical force to obtain the defendant's blood was objectively reasonable. Mason, 1996 WL 1112000, at *12. We find the reasoning and analysis of Judge Jones to be sound.

Here, although it is somewhat unclear from the Defendant's brief, it does not appear that the Defendant challenges the method by which his blood sample was taken, nor does he argue that he refused consent for blood tests.[5] Rather,

---

[5] In his brief, the Defendant states,
> It is clear from the record that the Appellant, Roy A. Jordan, refused the breath test and was subjected to a blood alcohol test. The Appellant, Roy A. Jordan, refused the field sobriety tests. On the 25th day of October, 1996 the Appellant refused to submit to the breath alcohol testing.

He makes no other references to the method of procuring his blood sample.

it appears that the Defendant raises a general challenge to the constitutionality of Tennessee Code Annotated § 55-10-406(e)[6] and contends that because the statute is unconstitutional, the State should have procured a search warrant before drawing a sample of his blood.

Based upon legal analysis of this issue by both the United States Supreme Court and this Court in previous cases, as summarized herein, we conclude that Tennessee Code Annotated §55-10-406(e) is constitutional. Our case law requires that specific procedures must be followed in obtaining a blood sample from a defendant charged with vehicular homicide and even allows the forcible taking of blood in certain situations. We are unpersuaded to overrule previous holdings by this Court on this issue. Because the Defendant points to no evidence in the record that he refused consent to the blood-alcohol test performed on him the night of the accident or that his blood was drawn in violation of the standards set forth in Mason, we conclude that the trial court properly denied the Defendant's motion to suppress the results of the test.

The judgment of the trial court is accordingly affirmed.

---

[6] The Defendant argues that when the issue of the constitutionality of Tennessee Code Annotated § 55-10-406(e) was raised in State v. Bullington, 702 S.W.2d 580, 583 (Tenn. Crim. App. 1985), this Court "did not specifically address the constitutionality other than the general conclusory opinion" that the statute passes constitutional muster. We note that in Bullington, this Court relied upon two United States Supreme Court cases in concluding, "The State may compel submission to [blood alcohol] testing if the officer has reasonable grounds to believe that the motorist is intoxicated." Id. at 583. In addition, this Court found the statute to be constitutional in State v. Terry Fowler, Lake County No. 4, 1985 WL 3545 (Tenn. Crim. App., Jackson, Nov. 6, 1985).

_____
                    DAVID H. WELLES, JUDGE


CONCUR:


_____
JOE G. RILEY, JUDGE


_____
THOMAS T. WOODALL, JUDGE