IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 6, 2001

## STATE OF TENNESSEE v. JEFFREY E. COPELAND

**Appeal from the Circuit Court for Dyer County**
**No. C99-12     Russell Lee Moore, Jr., Judge**

---

**No. W2000-00346-CCA-R3-CD - Filed April 9, 2001**

---

The defendant appeals from his conviction for vehicular homicide, contesting the sufficiency of the evidence and the denial of his motion to suppress the result of his blood alcohol test. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JERRY L. SMITH and JOE G. RILEY, JJ., joined.

Jim W. Horner, District Public Defender; John W. Derington, Assistant Public Defender (at trial and on appeal), and Clifford K. McGown, Jr., Waverly, Tennessee (on appeal), for the appellant, Jeffrey E. Copeland.

Paul G. Summers, Attorney General and Reporter; Lucian D. Geise, Assistant Attorney General; and C. Phillip Bivens, District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Jeffrey E. Copeland, appeals as of right from his conviction by a Dyer County Circuit Court jury for vehicular homicide as the proximate result of driver intoxication, a Class B felony. The defendant was sentenced as a Range I, standard offender to eight years incarceration. The defendant contends that (1) the evidence is insufficient to support his conviction and (2) the trial court erred in failing to suppress the result of his blood alcohol test.

This case arises from a one-car accident and the resulting death of Martha Haynes. At trial, Luis Rodriguez, co-owner of the Shady Rest bar, testified as follows: On January 8, 1999, Ronnie Goodman, the defendant, and a female patronized the Shady Rest. Mr. Goodman arrived before the defendant and the defendant's female companion, who arrived between 6:00 and 9:00 p.m. and stayed for two or three hours. He did not know the defendant or the female before this evening. After meeting them, he played pool with the female for some time, then the female went outside to

start the defendant's car. A few minutes later, she came inside and told the defendant, who was talking to Mr. Goodman at the bar, to come outside if he wanted to go with her. The defendant left, and Mr. Goodman left one to two minutes later. Shortly thereafter, the lights in the bar flickered, and then Mr. Goodman came into the bar and said that there had been a wreck and to call 911. Mr. Rodriguez testified that he closed the bar at midnight because the roads were "getting bad." He stated that he did not have any problems driving home but that he was driving slowly.

Michelle Fritz testified as follows: On January 8, 1999, she was working as the bartender at the Shady Rest, which was off Old Highway 51. Ronnie Goodman, who was a regular customer, the defendant, and a female named Martha were at the bar. She did not know the defendant or Martha before meeting them that evening. Mr. Goodman and the defendant drank Crown Royal and Coke, and a glass of beer was on the bar in front of Martha, although she did not know if Martha drank it. She did not serve Martha a beer after arriving at work at 9:00 p.m. At some point, she told the patrons that the roads were getting bad because it was sleeting. Then Martha and Mr. Goodman went outside. While they were outside, she looked out a window and saw Martha in the driver's seat of a car that was parked in front of the bar. Mr. Goodman's truck was parked behind the car but was not blocking the car's path. Martha came inside the bar a few minutes later and told the defendant to come outside if he wanted to go with her. After the defendant left the bar, she heard a car leaving the parking lot. The car's tires were "winding" on the ice that was on the parking lot. She was not looking out the window at this point and did not see who was driving the car. Then the lights in the bar blinked, and shortly thereafter, Mr. Goodman came into the bar and said to telephone for help because "they've hit a pole" and "she's in bad shape."

Ms. Fritz testified that it was sleeting that night and that her boyfriend had telephoned and told her to leave work early because the roads were getting bad. She said that she knew the interstate was closed because tractor trailers were driving past the bar on Old Highway 51. She stated that after the accident, they closed the bar between 11:00 p.m. and midnight. She said that she drove more slowly that night because the roads were icy but that she did not slide off the road or lose control of her car because the roads had been salted. She testified that she saw several salt trucks that night, including one that drove past the bar before the accident, although she did not know if it was salting the roads or on its way to get salt. She stated, however, that when she left the bar shortly after the accident, the roads had been salted.

Ronnie Goodman testified at the defendant's preliminary hearing but died before the defendant's trial. An audio tape recording of his testimony was played. Mr. Goodman testified as follows: On January 8, 1999, he went to the City Café in Newbern where he saw the victim, whom he knew, and the defendant, whom he had met. The defendant told him that he and the victim had already had about nine beers. Mr. Goodman, who did not have a drink at the City Café, told the defendant and the victim that he was going to the Shady Rest and invited them to join him.

Mr. Goodman testified that at the Shady Rest, he played pool with the defendant, and the victim played pool with Luis Rodriguez. Around 11:00 p.m., someone told them that the roads were getting bad, and the victim asked the defendant for the keys to his car. The victim then went outside

to start the car, and he went outside to start his truck a few minutes later. As he was sitting in his truck, he saw through the back window the defendant get into the driver's side of his car. Although the car did not leave for five to ten minutes, the defendant never got out of the car during this time. When the defendant left, he was driving pretty fast and almost lost control of the car as he drove out of the parking lot. The car did not slow down once it was on the road, and a few seconds later, Mr. Goodman saw a blue flash. He then got out of his truck and walked to the road. He could not see the defendant's taillights so he went inside the bar and said to call for help. He then drove to the accident scene, where the defendant's car was in a ditch and almost completely covered by water. He saw the defendant swimming to the bank on the opposite side of the road, but he did not see the victim. He then left the scene after a trooper arrived and told him to move his truck. On his way home, he stopped at the house of the victim's mother, whom he knew, and told her that her daughter had been in an accident.

Mr. Goodman testified that he only had one drink, a Crown Royal and Coke, that night. He stated that the victim did not act intoxicated but that the defendant "could not handle a vehicle to be driving home." He said that it had been sleeting that night but that it was not sleeting when the defendant left the bar. He admitted that although he never saw the defendant get out of the car after getting into the driver's seat, he could not testify as to what happened inside the car. He stated that the defendant told him that he did not allow other people to drive his car. Mr. Goodman also said that a salt truck passed the bar before the defendant left. He admitted that he did not talk to the police about the accident until the next day.

Ricky Gatlin, a Dyer County constable and medical director of the county rescue squad, testified as follows: He had just finished working an accident on Highway 51 when he received a call regarding a car that was in a ditch off Highway 211, which was also called Old Highway 51. When he arrived, he shined his floodlights on the ditch and saw a car almost completely submerged in water. A man on the opposite bank was shouting to "save her." Then he saw a person floating in the water a few feet in front of the car on the driver's side. With the help of some bystanders, he got the person, a female, out of the water. She did not have any vital signs, and attempts to resuscitate her were unsuccessful.

Charles Riggs, a paramedic with the Methodist Hospital Ambulance Service, testified as follows: On January 8, 1999, he was at the accident scene and examined a female who was lying on the side of the road. He was told that the first responders had unsuccessfully tried to revive her. The female had severe chest trauma, some head trauma, and no vital signs. He also attempted to examine the defendant, who was in the back of a sheriff's patrol car. The defendant did not have any visible injuries and did not complain about any injuries. The defendant, who repeatedly asked about the female, was wet and appeared to be going into hypothermia. On cross-examination, Mr. Riggs testified that he asked the defendant who had been driving, and the defendant said that the female had been.

Dyer County Sheriff's Deputy John Justice testified that he was at the accident scene and asked the defendant who had been driving the car, to which the defendant responded that his

girlfriend had been driving because he was too intoxicated to drive. He said that the defendant did not have any visible injuries and did not complain about any injuries. He stated that he drove the defendant to the emergency room and that although the defendant kept asking about his girlfriend, he did not tell the defendant that she had died.

Trooper Frank McLin with the Tennessee Highway Patrol testified as follows: On the night of January 8, 1999, it was sleeting, the roads were icy, and he worked several accidents before receiving a call about the defendant's accident. When he arrived on the scene, a constable told him that a female had been pulled from the water but that she was dead. Trooper McLin determined that the female was Martha Haynes. He then talked to the defendant, who was in the back of a patrol car. The defendant was wet, extremely cold, and shaking, and at that time, he would not answer many questions. The defendant asked about the victim's condition and said that the victim had been driving and that the accident was his fault because he should have been driving. The defendant did not have any visible injuries and did not complain about any injuries.

Trooper McLin testified that the car was a two-door, 1988 Ford Thunderbird with bucket seats separated by a console. He said that he saw the car when it was towed from the water and that the passenger's door was closed. He stated that the car hit a wooden utility pole, causing it to break. He testified that there was significant damage to the car about six or seven inches behind the passenger's door but there was no damage to the driver's side of the car. He stated that the windshield was intact but that all the other glass windows were shattered.

Trooper McLin testified that after he left the scene, he went to the hospital, where he asked a nurse to withdraw blood from the defendant and the victim. He stated that these requests were made around 2:40 a.m. He said that he labeled the blood and mailed the samples to the Tennessee Bureau of Investigation (TBI) crime laboratory.

Robert Marshall, a TBI forensic scientist, testified that he performed the blood alcohol analysis on the samples withdrawn from the defendant and the victim. He stated that the defendant's alcohol concentration was 0.14 percent and that the victim's was 0.21 percent. Mr. Marshall testified that generally a person's blood alcohol concentration would peak about one hour after his or her last drink and that the body would metabolize alcohol at a rate of 0.01 to 0.02 percent per hour thereafter. He stated that the amount of alcohol the person drank would affect how much the blood alcohol concentration increased during the hour after the last drink but that the amount consumed would not affect the rate at which the body would metabolize the alcohol.

Tennessee Highway Patrol Sergeant Tansil Phillips was qualified as an expert witness in accident reconstruction, including occupant placement within a vehicle. Sergeant Phillips testified that the accident occurred as follows: The car, a two-door Thunderbird, was traveling south on a two-lane highway when it drove onto the west shoulder and then back across both lanes, leaving the east side of the highway. When the car left the highway, it initially slid sideways and then went airborne until the passenger's side, just behind the door, struck a utility pole. Upon striking the pole,

the car rotated to a vertical position in which its front was in the ditch that ran parallel to the road, and then the car fell onto its wheels with the front of the car to the north.

Sergeant Phillips testified that his examination of the car the day after the accident revealed extensive damage behind the passenger's door where the car had struck the utility pole and that the passenger's door was closed and could not be opened. He stated that something struck the inside of the passenger's door, causing "the door to bow to the outside." He said that there was no damage to the driver's side or to the steering wheel, stating that the tilt mechanism on the car's three-position, tilt steering wheel was working properly. Photographs of the damage to the car's exterior and interior were admitted into evidence.

Sergeant Phillips testified that he saw photographs of the victim's body and that he was able to match her injuries to items inside the car: First, the one-sixteenth of an inch striations on the victim's left cheek matched the striations of a radio speaker cover on the dashboard in front of the passenger's seat. Second, a long, circular mark on the victim's chest was the same length and width as the "pull strap," which he described as being on the passenger's door above the armrest and enabling a passenger to grab hold of it and shut the door. He said that the mark on the victim's chest was too long and wide to be the result of an impact with the steering wheel. Finally, a V-shaped mark on the victim's chest was consistent with an impact with the corner of the armrest on the passenger's door. Sergeant Phillips stated that from his investigation and reconstruction of the accident, he determined that the victim was the passenger and the defendant was the driver. On cross-examination, Sergeant Phillips testified that the glass in all of the car's windows, except the windshield, broke during the accident.

Dr. O'Brian Cleary Smith, who was the interim medical examiner for Shelby County, testified as follows: On January 9, 1999, he performed the autopsy on the victim's body and determined that the victim's chest injuries were caused by severe impact forces. Her breast bone was fractured, and her aorta, the largest artery of the human body, was torn, which caused internal bleeding and death. Upon seeing the curved-shaped bruise on the victim's chest, his initial impression was that the injury resulted from an impact with the steering wheel. However, after examining the steering wheel and pull strap, which were brought to him by Sergeant Phillips, he concluded that the steering wheel could not have caused the injury to the victim's chest. The injury was consistent with an impact with the pull strap from the passenger's door. Also, a V-shaped bruise on the victim's chest was consistent with an impact with the armrest of the passenger's door. Finally, the pattern of the abrasions on the victim's left cheek matched the pattern of the radio speaker cover on the dashboard in front of the passenger's seat. Dr. Smith concluded that the victim had to have been in the passenger's seat to sustain her injuries, specifically excluding the possibility that another person could have been between the victim and the passenger's door when the car hit the utility pole. He stated that he did not examine the car and that his analysis was based upon talking to Sergeant Phillips and the district attorney and examining the steering wheel, pull strap, and photographs of the car. Dr. Smith also testified that a living person can metabolize alcohol at a rate of 0.01 to 0.02 grams per deciliter per hour but that once a person has died, the body loses the ability to break down alcohol.

Danny Williams testified that on January 8, 1999, he was an emergency medical technician (EMT) with Methodist Hospital and that he attempted to treat the defendant at the accident scene. He stated that the defendant was shaking and had ice on his pants. He said that the defendant was combative and would not allow him to take his blood pressure or to transport him to the hospital. He said that because trauma from an impact with the steering wheel can cause people to become combative, he asked the defendant if he was driving, to which the defendant responded that he was not.

David Lowery testified that he worked at the body shop where the defendant's car had been kept since the accident. Pursuant to the defendant's request, Mr. Lowery had removed and brought the driver's door to the trial. He stated that glass was in the body of the door and that the glass was not broken. He said that the window raised and lowered electronically and that once the car was under water, the window probably could not have been raised or lowered.

The defendant testified as follows: On January 8, 1999, he went with the victim to Dave's City Café, where they each had three or four beers and played pool. While they were there, a man named Ronnie, who was a friend of the victim, joined their pool game and drank beer with them. Ronnie told the defendant and the victim that he was going to the Shady Rest. After finishing playing pool, the defendant and the victim went to the Shady Rest, where Ronnie and the defendant drank Crown Royal and Coke and played pool. The victim played pool with Mr. Rodriguez, the bar's co-owner. At some point, the defendant gave the victim the keys to his car so she could warm it up. A few minutes later, the victim returned and told him to come outside if he wanted to go with her. He then went outside and although he did not know how much the victim had to drink at the Shady Rest, he thought that he was more intoxicated than she. Nevertheless, he tried to persuade her to let him drive, but the victim locked the door and only allowed him to get in the passenger's seat. Because of the freezing rain, he told the victim to drive carefully, to which she responded that she knew how to drive. He fell asleep one to two minutes later, which was before they left the parking lot.

The defendant testified that when he awoke, his head was under water. He said that he was able to poke his head above the water to get some air and that he then went under the water to look for the victim. He stated that he could not see or feel her and that he then swam out through a window, although he did not know which one. He said he remembered lying on the bank and seeing somebody give the victim CPR (cardiopulmonary resuscitation), but he did not remember being in the patrol car, being taken to the hospital, or having his blood withdrawn. He testified that his left shoulder and left knee were sore and bruised as a result of the accident.

On cross-examination, the defendant said that he drove from the City Café to the Shady Rest around 6:30 p.m. and that the roads were in good condition. He stated that he did not awake when the car hit the utility pole and that it was possible that he lost consciousness, as opposed to falling asleep, before they left the parking lot.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his conviction for a Class B vehicular homicide because there was no proof that his intoxication caused the accident. He emphasizes that there were many accidents in Dyer County that night as a result of the bad weather and road conditions. He argues that the evidence at best establishes a Class C vehicular homicide. See Tenn. Code Ann. § 39-13-213(a)-(b). The state contends that the evidence is sufficient to support the defendant's conviction.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Vehicular homicide is

the reckless killing of another by the operation of an automobile . . .

(1) As the proximate result of conduct creating a substantial risk of death or serious bodily injury to a person; or

(2) As the proximate result of the driver's intoxication as set forth in § 55-10-401. For the purposes of this section, "intoxication" includes alcohol intoxication as defined by § 55-10-408, drug intoxication, or both.

Tenn. Code Ann. § 39-13-213(a)(1)-(2). Vehicular homicide is a Class C felony unless it is the proximate result of driver intoxication, in which case it is a Class B felony. Tenn. Code Ann. § 39-13-213(b). When a defendant has blood alcohol content of 0.10 percent or more, then he is presumed to be under the influence of an intoxicant with his ability to drive impaired. See Tenn. Code Ann. § 55-10-408(a).

The evidence viewed in the light most favorable to the state reveals that the defendant was recklessly driving his car when the accident occurred. Mr. Goodman testified that he saw the defendant get into the driver's seat of his car and that the defendant did not get out of his car before leaving the Shady Rest five to ten minutes later. The defendant told Mr. Goodman that he did not allow other people to drive his car. Although it had been sleeting that evening, the defendant drove fast out of the parking lot, almost losing control of his car, and did not slow down once he was on the road. Shortly thereafter, the defendant's car crossed both lanes, went airborne, hit a utility pole, and landed in a ditch of water. During the accident, the victim's aorta was torn, which caused her

death. Sergeant Tansil Phillips, an expert in accident reconstruction and occupant placement, testified that the victim's injuries matched items from the passenger's side of the car. Sergeant Phillips concluded that the victim was the passenger and the defendant was the driver. Dr. O'Brian Cleary Smith testified that the victim had to have been in the passenger's seat when the accident occurred to sustain her injuries. Dr. Smith specifically excluded the possibility that a person could have been between the victim and the passenger's door.

The evidence also reveals that the defendant was intoxicated. Expert testimony provided that the defendant's blood alcohol content would have peaked about one hour after his last drink and then decreased at a rate of 0.01 to 0.02 percent per hour thereafter. The defendant's blood alcohol content almost four hours after the accident was 0.14 percent. Based upon this percentage, the defendant is presumed to have been under the influence of an intoxicant and his ability to drive thereby impaired. See Tenn. Code Ann. § 55-10-408(a). Furthermore, the defendant stated that he was too intoxicated to drive and that he was more intoxicated than the victim, who had a blood alcohol content of 0.21 percent at the time of her death.

The defendant argues that the above evidence only supports a Class C vehicular homicide conviction because there was no evidence that his intoxication caused the accident, emphasizing that the bad weather that night caused many accidents. We disagree. Based upon the defendant's blood alcohol percentage, his ability to drive is presumed to have been impaired. Moreover, Mr. Goodman and Michelle Fritz testified that they saw a salt truck pass the Shady Rest before the defendant left. Ms. Fritz also stated that tractor trailers had been driving past the bar on Old Highway 51 during the night and that the roads had been salted when she left the bar shortly after the accident. Several witnesses testified that they drove that night without any problems. A rational jury could have found beyond a reasonable doubt that the accident was the proximate result of the defendant's intoxication. Accordingly, the evidence is sufficient to support the defendant's conviction for Class B vehicular homicide.

## II. SUPPRESSION OF THE DEFENDANT'S BLOOD ALCOHOL TEST RESULT

The defendant contends that the trial court erred in refusing to suppress the result of his blood alcohol test, arguing that he did not consent to having his blood withdrawn at the hospital, that a search warrant was not obtained, and that Trooper McLin, who requested the blood sample, did not have probable cause to believe that he had committed vehicular homicide. The state contends that the trial court correctly denied the defendant's motion.

A trial court's decision on a motion to suppress will be upheld unless the evidence in the record preponderates against it. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Further, questions of the "credibility of witnesses, the weight and value of the evidence, and the resolution of conflicts in the evidence are matters entrusted to the trial judge as a trier of fact." Id. The prevailing party "is entitled to the strongest view of the evidence, as well as all reasonable and legitimate inferences that may be drawn from the evidence." Id. Finally, both the proof adduced at the suppression

hearing and the proof adduced at trial may be considered in reviewing the trial court's decision on the motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

At the suppression hearing, the parties stipulated that the defendant did not consent to having his blood withdraw. Trooper Frank McLin was the only witness, and he testified as follows: He arrived at the accident scene a little after 11:00 p.m. He saw the car in the ditch that ran parallel to Highway 211, and the car was almost completely submerged in water. A female was lying on the bank nearest to the road, and it was determined at the scene that she was dead. The defendant was in the back of a sheriff's patrol car, and when Trooper McLin asked the defendant if he had been drinking, the defendant responded that he had drunk too much and that was why he was not driving. The defendant, whose breath had a strong odor of alcohol, was shaking and had ice on his beard and was taken to the hospital between midnight and 12:15 a.m. Trooper McLin, who stayed on the scene for some time after the defendant left, learned that the defendant and the victim were the only people inside the car and that the car was registered to the defendant. When he went to the hospital, he asked a nurse to withdraw a blood sample from the defendant, which she did at 2:45 a.m.

Tennessee Code Annotated section 55-10-406(e) provides that the results of a defendant's blood alcohol test may be admissible in criminal prosecutions for aggravated assault or vehicular homicide when the defendant's blood was "obtained by any means lawful," even when the defendant did not consent to having his blood withdrawn. See State v. Huskins, 989 S.W.2d 735, 738 (Tenn. Crim. App. 1998) (stating that subsection 55-10-406(e) addresses "the admissibility of otherwise lawfully obtained test results where the sample was not voluntarily taken, i.e. when the defendant refuses to submit voluntarily to testing or when the defendant is unconscious or otherwise incapable of rendering consent at the time the sample is drawn"). Relying upon Schmerber v. California, 384 U.S. 757, 86 S. Ct. 1826 (1966), this court has adopted four prerequisites that must be satisfied before the results of a compelled blood alcohol test are admissible. State v. Jordan, 7 S.W.3d 92, 98-99 (Tenn. Crim. App. 1999).

The State must prove by a preponderance of the evidence that:

a) The officer compelling the extraction of blood from the accused has probable cause to believe that the accused committed the offense of aggravated assault or vehicular homicide while under the influences of an intoxicant or drug, and there is a clear indication that evidence of the accused's intoxication will be found if the blood is taken from the accused's body and tested;

b) Exigent circumstances exist to forego the warrant requirement;

c) The test selected by the officer is reasonable and competent for determining blood-alcohol content; and

d) The test is performed in a reasonable manner.

Id. (citations omitted).

At the suppression hearing, the defendant conceded that the third and fourth prerequisites were satisfied but argued that the first two were not. Regarding the first prerequisite, the trial court found that the defendant had a strong odor of alcohol on his breath and that the car was registered to the defendant. The court noted that the defendant said he was not driving, but it pointed out that because the other person in the car was dead, she could not testify. Based upon these facts, the court found that Trooper McLin had probable cause to believe that the defendant committed aggravated assault or vehicular homicide. The court also found that Trooper McLin was justified in believing that the blood alcohol test would clearly find intoxication on the part of the defendant. Regarding the second prerequisite, the trial court found that when Trooper McLin requested the blood sample at 2:45 a.m., "exigent circumstances existed as alcohol was rapidly dissipating from Defendant's body simply because of the time element."

The evidence in the record reveals that before Trooper McLin requested the blood sample, he knew that the defendant's breath had a strong odor of alcohol and that the defendant told him that he was not driving because he was too intoxicated. Further, he had determined that the car was registered to the defendant and that the defendant and the victim were the only people in the car at the time of the accident. Although Trooper McLin's testimony at the suppression hearing does not elaborate upon his investigation at the scene before he went to the hospital, his trial testimony reveals that he saw the car when it was towed from the water. At that time, he saw that the passenger's side of the car was severely damaged and that the driver's side was not damaged. We conclude that the evidence does not preponderate against the trial court's findings that Trooper McLin had probable cause to believe the defendant committed vehicular homicide and that there was a clear indication that evidence of the defendant's intoxication would be found from testing a blood sample.

The trial court also found that exigent circumstances existed to forego the warrant requirement. In Schmerber v. California, 384 U.S. at 758-59, 86 S. Ct. at 1829, the defendant, who had been arrested for driving under the influence, was at a hospital being treated for injuries when a police officer requested that blood be withdrawn from the defendant. Although the defendant did not consent, his blood was withdrawn and the results of its analysis were admitted at trial. The Supreme Court concluded that it was reasonable for the officer to believe that he "was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'" Id. at 770, 86 S. Ct. at 1835 (citation omitted). The Court noted that the percentage of alcohol in a person's blood begins to diminish shortly after a person's last drink. Id. at 770-71, 86 S. Ct. at 1836 ("Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of an accident, there was no time to seek out a magistrate and secure a warrant.").

In this case, Trooper McLin knew that the accident occurred around 11:00 p.m. The defendant was taken to the hospital between midnight and 12:15 a.m. After staying on the scene to investigate the accident, Trooper McLin went to the hospital and requested a nurse to withdraw blood from the defendant, which was done at 2:45 a.m., almost four hours after the accident. We

conclude that the evidence does not preponderate against the trial court's finding.  Accordingly, the trial court did not err in denying the defendant's motion to suppress.

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE