IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 15, 2015 Session

**STATE OF TENNESSEE v. CARLA R. RICHTER**

**Direct Appeal from the Circuit Court for Maury County**
**No. 22516     Stella Hargrove, Judge[1]**

---

**No. M2014-01913-CCA-R3-CD – Filed December 22, 2015**

---

A Maury County Circuit Court Jury convicted the Appellant, Carla R. Richter, of driving under the influence (DUI), fourth offense; driving on a revoked license; and speeding. The trial court imposed a total effective sentence of four years. On appeal, the Appellant contends that the trial court erred by denying her motion to suppress, arguing that she did not knowingly and voluntarily consent to a blood test. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Cory L. Ricci, Columbia, Tennessee (on appeal), and Gary Howell, Mt. Pleasant, Tennessee (at trial), for the Appellant, Carla R. Richter.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; T. Michel Bottoms, District Attorney General; and Brent A. Cooper and M. Caleb Bayless, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In May 2013, a Maury County Grand Jury returned a multi-count indictment against the Appellant, charging her with driving under the influence (DUI), fourth

---

[1]Judge Robert L. Holloway, Jr., presided over the suppression hearing and signed the order denying the motion to suppress. Judge Stella Hargrove presided over the remaining proceedings.

offense; operating a motor vehicle without a functioning ignition interlock device; driving on a revoked license; reckless endangerment; possession of marijuana; reckless driving; speeding, and "violation of turning movements."

Prior to trial, the Appellant filed a motion to suppress the results of the blood alcohol test, arguing that her consent to the test was not knowingly or voluntarily given because the officer advised her that she was required to submit to the blood draw. At the suppression hearing, the parties relied upon the videotape of the traffic stop and the arguments of counsel. The trial court took the matter under advisement and subsequently filed a written order denying the motion to suppress.

Before trial, the State dismissed the charges of operating a motor vehicle without a functioning ignition interlock device, reckless endangerment, reckless driving, and violation of turning movements.

At trial, Tennessee Highway Patrol Trooper Allen Leverette testified that on October 25, 2012, he was traveling southbound on Highway 31 near downtown Columbia in a marked Ford Crown Victoria when he saw a vehicle traveling northbound at a high rate of speed. He activated the patrol car's radar equipment which showed that the vehicle was traveling sixty-six miles per hour in a forty-five miles per hour zone. Trooper Leverette slowed to make a U-turn and saw the vehicle leave its lane and almost strike a vehicle that was traveling in the right-hand lane.

Trooper Leverette said that he caught up with the vehicle at Bear Creek Pike where it had stopped at a red light. When the light turned green, the vehicle sped away and was going sixty-five or seventy miles per hour. At another intersection, the vehicle made a left turn. Trooper Leverette initiated a traffic stop around Burt Drive by turning on his blue lights, which in turn activated the video camera in his car. The vehicle stopped on an incline in the middle of its lane of traffic. The video of the stop was shown to the jury.

Trooper Leverette said that he detected an odor of alcohol coming from inside the vehicle as he approached the Appellant, who was alone in the vehicle. The Appellant's eyes were bloodshot and watery, and her speech was slurred. Upon questioning, the Appellant admitted that she had consumed two beers at a restaurant that evening. Trooper Leverette asked her to step out of the vehicle, and she staggered as she complied. Once she was out of the vehicle, Trooper Leverette detected the odor of alcohol on the Appellant.

Trooper Leverette said that he asked the Appellant to perform field sobriety tests and that he offered to drive her to the bottom of the hill where the ground was flat. The Appellant agreed, and Trooper Leverette drove her to the entrance to a subdivision. The

video shows that when they arrived at the entrance to the subdivision, the Appellant told Trooper Leverette that she had "maybe four Coronas" earlier that night.

Trooper Leverette had the Appellant perform "the nine-step-walk-and-turn" test to see if she could follow instructions and maintain her balance.[2] The Appellant said that she did not have any medical issues that would impair her performance on the test. Trooper Leverette said that during the instructions, the Appellant was unable to keep her balance. The Appellant started taking steps too soon and did not "maintain her feet, right foot in front of left or left foot in front of right." Additionally, she did not touch heel to toe, raised her arms higher than six inches, and made an improper turn.

The next task was the "one-leg stand," during which Trooper Leverette looked for four indicators of intoxication: swaying, putting her foot down, hopping, and raising her arms. The Appellant performed poorly on the test, exhibiting each of the indicators of intoxication.

Finally, Trooper Leverette had the Appellant perform a "Romberg" test. The test required the Appellant to close her eyes and estimate when thirty seconds had passed; at that time, she was to open her eyes and tell the trooper to stop. Trooper Leverette explained that during the test, he was looking for eyelid or body tremors. Additionally, a discrepancy of six seconds either way would indicate that a substance was in her system that either slowed down or sped up her "internal clock." Trooper Leverette said that the Appellant never said "stop" to indicate when she thought the thirty seconds had passed; therefore, the test was inconclusive. Based upon the Appellant's demonstrating "multiple clues of impairment," Trooper Leverette arrested her for DUI.

Trooper Leverette stated that during a search of the Appellant's vehicle after the arrest, he found a burned marijuana cigarette on the driver's seat, around where her right leg would have been. Thereafter, Trooper Leverette read the Appellant the Tennessee Implied Consent Form, and she agreed to a blood test. Trooper Leverette took the Appellant to a hospital, and a phlebotomist drew her blood. The vials of blood were sealed in a box that Trooper Leverette later sent to the Tennessee Bureau of Investigation (TBI) for testing. The testing revealed that the Appellant's blood alcohol content was .08%. Trooper Leverette said that he had thought the Appellant's blood alcohol content would be higher, noting that she had seemed "a lot more intoxicated than that."

On cross-examination, Trooper Leverette said that the Appellant initially told him that she drank two beers at Legends, a restaurant in Pulaski. He acknowledged that the Appellant may have told him that she was nervous and suffered from anxiety. During the

---

[2]The video reveals that Trooper Leverette first performed the horizontal gaze nystagmus (HGN) test on the Appellant by shining a light into her eyes.

Romberg test, the Appellant was supposed to close her eyes, hold her head back, wait an estimated thirty seconds after Trooper Leverette said "go," then open her eyes, look at Trooper Leverette, and say "stop." Trooper Leverette acknowledged that the Appellant looked at him but that she failed to say "stop." When asked by defense counsel if the Appellant looked at Trooper Leverette after approximately twenty-seven seconds, Trooper Leverette said, "[T]hat sounds familiar, yes, sir."

Trooper Leverette said that at the time he saw the Appellant almost strike another vehicle, the video camera was not activated. He said that the stop occurred around 11:57 p.m.

On redirect examination, Trooper Leverette said that when he investigated the status of the Appellant's driver's license, he learned that it had been revoked.

Melinda Quinn, a special agent forensic scientist with the TBI's crime laboratory, said that she tested the Appellant's blood and that the blood alcohol content was .08%. Agent Quinn noted that the "legal limit in Tennessee is 0.08." She stated that as a person's blood alcohol content increased, their judgment, critical thinking skills, and reaction times were impacted.

On cross-examination, Agent Quinn acknowledged that recently "there has been a little controversy" at the TBI about some blood alcohol content results that were not correct. She stated that she was not asked to test the Appellant's blood for marijuana.

On redirect examination, Agent Quinn clarified that the problems were with one report created by Special Agent Carl Bower. After the problem was discovered, all of the samples Agent Bower tested were subjected to retesting.

The Appellant chose not to testify or put on proof. The jury found the Appellant guilty of DUI, fourth offense; driving on a revoked license; and speeding.[3] At the sentencing hearing, the trial court sentenced the Appellant to four years for the DUI, fourth offense conviction and eleven months and twenty-nine days for the driving on a revoked license conviction. The court assessed a fine of ten dollars for the speeding conviction. The court ordered the sentences to be served concurrently for a total effective sentence of four years.

On appeal, the Appellant contends that the trial court erred by denying her motion to suppress the results of the blood alcohol test.

## II. Analysis

---

[3]The jury found the Appellant not guilty of possession of marijuana.

Prior to trial, the Appellant filed a motion to suppress, arguing that her consent to the blood test was not knowingly or voluntarily given because the officer advised her that she was required to submit to the blood draw.

The video, which was reviewed by the trial court at the suppression hearing and was later shown to the jury at trial, shows Trooper Leverette following the Appellant's vehicle, which was a pickup truck. At a red light, the Appellant drove into the intersection and stopped. When the light turned green, the Appellant turned left. Trooper Leverette continued to follow her and activated the blue lights on his patrol car. The Appellant stopped the truck in the middle of the lane of traffic instead of on the shoulder of the road, and Trooper Leverette parked behind her. He approached the driver's side and told her that he had stopped her for speeding and for entering the intersection while the light was red, which he said was "running the light." Trooper Leverette asked the Appellant if she had been drinking any alcohol. Her response cannot be heard, but Trooper Leverette said, "Yeah. 'Cause you almost hit a car back there, too." He asked how much alcohol she had consumed. Once again, her response cannot be heard, but Trooper Leverette stated, "Two beers? Where at?" He also requested that she speak louder. Trooper Leverette's comments indicate that the Appellant responded that she had been drinking at Legends in Pulaski and that she drank two twelve ounce bottles of Corona beer. Trooper Leverette said that he needed her to perform field sobriety tests so he could make sure it was safe for her to drive. He said that he would drive her a short way down the street to a flat area that was safer for the field sobriety tests. Once they arrived at the location, Trooper Leverette asked the Appellant when she started drinking. Her response about the time was indiscernable, but she stated that she had "maybe four Coronas." Trooper Leverette allowed the Appellant to remove her boots before beginning the tests.

The video reveals that after the Appellant performed the tests, Trooper Leverette arrested her for DUI. She asked for and received permission to call her husband to come get her truck. When her husband arrived, he seemed reluctant to speak with her. The Appellant told Trooper Leverette to tell her husband that she had hidden some money that he did not know about and that he was to pay her bail with that money. Her husband told the trooper that he had planned to call her mother because "that's what she did last time." Trooper Leverette asked, "How many times?" The Appellant's husband replied, "This will be her fourth," and stated that the Appellant had three prior convictions of DUI.

The video reveals that Trooper Leverette then spoke with the Appellant. He said, "Tennessee has new mandatory blood draw laws for people with prior convictions, okay? And you have prior convictions for DUI, right?" The Appellant's response is inaudible, but Trooper Leverette then stated, "I'm going to read you the mandatory." He then read the following provisions from the implied consent form:

There's probable cause to believe that you have committed a crime that requires blood or breath testing.

If you refuse to submit to either or both of these tests, they will not be given unless required by law. If you do refuse to be tested your license will be suspended for at least one year and up to five years, depending on your driving history. Also, if you refuse you may be ordered to install and keep an ignition interlock on your vehicle for one year or more.

If your license is currently suspended for DUI, Vehicular Assault, Vehicular Homicide or Aggravated Vehicular Homicide and you refuse or attempt to refuse to submit to either or both tests, you commit the crime of violating the implied consent law. If a Judge finds you guilty of this separate offense, a Judge shall sentence you to a minimum of five days and up to eleven months and twenty-nine days in jail in addition to any sentence for DUI and a mandatory fine of up to $1,000.

The video shows that while Trooper Leverette was reading the foregoing, the Appellant interrupted him twice to say that she was willing to have a blood test. The trooper told her that he needed to finish advising her and continued:

After being informed . . . there is probable cause that you have committed a crime which requires you to submit to a blood or breath test, and after being requested to submit to a chemical test to determine the alcohol and/or drug content of your blood, and also having the consequences of refusing to submit to such tests explained to you, will you or will you not submit to a blood test?

The Appellant again said that she was willing to submit to a blood test. She was shown the implied consent form, and she checked a box indicating that she consented to a test or tests and signed on a line below the box.

No other proof was presented at the hearing.  The trial court took the matter under advisement.[4]  In a written order, the trial court found that Trooper Leverette advised the Appellant

> that "If your license is currently suspended for DUI . . . and you refuse or attempt to refuse to submit to either or both tests, you commit the crime of violating the implied consent law."  She was then advised if she was found "guilty of this separate offense the Judge shall sentence you to a minimum of five days and up to eleven months and twenty-nine days in jail in addition to any sentence for DUI and mandatory fine of up to $1,000."  After being advised of the consequences of refusing and being advised that if she did refuse, her blood would be drawn anyway, she consented to a test.

Based upon the foregoing facts, the trial court held that

> [t]here is no proof that [the Appellant] was told that she would have her blood drawn without a warrant.  There is no proof that Trooper Leverette would not seek a warrant from a neutral and detached magistrate.  [The Appellant] consented to [having] her blood drawn after Trooper Leverette explained the legal ramification for refusal to consent.  The Court finds under the totality of circumstances that her consent was freely and voluntarily given[.]

The court denied the motion to suppress.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact."  State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).  Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise."  Id.  Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo.  See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).  Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence."  Odom, 928 S.W.2d at 23.  Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial

---

[4]Defense counsel advised the court in the written motion to suppress and at the suppression hearing that Tennessee case law had not yet addressed the new mandatory blood draw law.

motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." State compelled blood draws are considered searches for the purposes of the Fourth Amendment. State v. Jordan, 7 S.W.3d 92, 98 (Tenn. Crim. App. 1999) (quoting Schmerber v. California, 384 U.S. 757, 767 (1966)); see also Missouri v. McNeely, __ U.S. __, 133 S. Ct. 1552, 1558 (2013). Generally, a warrantless search is considered presumptively unreasonable, thus violative of constitutional protections. See State v. Walker, 12 S.W.3d 460, 467 (Tenn. 2000). Therefore, a warrant is typically required to justify a blood draw. Nonetheless, our supreme court has noted that, "[i]t is, of course, well settled that one of the exceptions to the warrant requirement is a search conducted pursuant to consent." State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973), and State v. Jackson, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993)). "The sufficiency of consent depends largely upon the facts and circumstances in a particular case." Jackson, 889 S.W.2d at 221. The prosecution bears the burden of proving that the appellant freely and voluntarily gave consent. State v. McMahan, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983). We further observe that "'[t]he existence of consent and whether it was voluntarily given are questions of fact.'" State v. Ashworth, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (quoting McMahan, 650 S.W.2d at 386).

The Appellant acknowledges that she was never physically restrained or "ever threatened with the same." Nevertheless, she contends that "the plain meaning and import of the words 'mandatory blood draw' could only have the effect of conveying to [the Appellant] that if she did not permit her blood to be drawn, she would be subject to the physical restraint and forcible needle injection in her immediate future." The Appellant maintains that her consent was given after the threat of a forcible blood draw and was therefore involuntary and contaminated by duress. The State responds that the Appellant expressly consented to the test and that the consent was knowingly and voluntarily given.

Recently, in State v. Patrick Lee Mitchell, No. M2014-01129-CCA-R3-CD, 2015 WL 2453095, at *2 (Tenn. Crim. App. at Nashville, May 22, 2015), this court addressed an appellant's contention that his consent to have his blood drawn was not valid becaue it was coerced by the threat of a mandatory blood draw pursuant to Tennessee Code Annotated section 55-10-406, which he claimed was "'inherently coercive.'" In analyzing the issue, this court found that the trooper was courteous to Mitchell and that, due to Mitchell's prior DUI conviction, he had some familiarity with the criminal justice system. Id. at *4. Further, this court stated that "the record does not establish that [Mitchell's] consent was rendered involuntary by the threat of a mandatory blood draw."

Id. This court concluded that the evidence did not preponderate against the trial court's finding that Mitchell voluntarily consented to having his blood drawn; therefore, we affirmed the judgment of the trial court. Id.

In the instant case, the proof reflects that the Appellant had been convicted of DUI on three prior occasions; therefore, she was familiar with the criminal justice system in general and with the procedures employed during a DUI stop. While Trooper Leverette read the implied consent form, the Appellant twice interrupted him to express her willingness to have a blood test. As the trial court noted, before Trooper Leverette read the section regarding the mandatory blood draw, the Appellant interrupted to say that she wanted the test. Once she was fully informed of the consequences of refusing the test, she again eagerly expressed her willingness to have her blood drawn. As in Mitchell, the foregoing facts do not preponderate against the trial court's finding that the Appellant knowingly and voluntarily consented to having her blood drawn.

### III. Conclusion

Finding no error, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE