IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 11, 2001

## STATE OF TENNESSEE v. DONALD W. BRANCH

**Direct Appeal from the Criminal Court for Shelby County**
**No. 98-03566, 03567, and 03568     Chris Craft, Judge**

---

**No. W1999-00506-CCA-R3-CD - Filed January 4, 2002**

---

After Defendant was convicted of two counts of aggravated vehicular homicide and one count of driving while license revoked, the trial court imposed an effective sentence of forty-nine years in confinement. On appeal, Defendant argues that the evidence was insufficient to sustain the convictions for aggravated vehicular homicide, the trial court's instructions to the jury were erroneous, the blood alcohol test results were admitted in error, the State's closing argument was improper, and his sentence is excessive. After a thorough review of the record, we find that the trial court improperly applied two enhancement factors. However, the errors affect only Defendant's sentence for one count of aggravated vehicular homicide and, therefore, we reduce this sentence by six months. We affirm the judgment of the trial court in all other aspects.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Criminal Court Affirmed as Modified.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and ROBERT W. WEDEMEYER, JJ., joined.

A.C. Wharton, Jr., District Public Defender; W. Mark Ward, Assistant Public Defender; Mozella Ross, Assistant Public Defender; and Marty McAfee, Assistant Public Defender, Memphis, Tennessee, for the appellant, Donald W. Branch.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; William L. Gibbons, District Attorney General; Michael Leavitt, Assistant District Attorney General; and Glen Baity, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Donald W. Branch, was indicted by the Shelby County Grand Jury for one count of driving while license revoked, one count of driving under the influence of an intoxicant ("DUI"), one count of reckless driving, two counts of vehicular homicide as the proximate result of the driver's intoxication, two counts of vehicular homicide as the proximate result of conduct creating a substantial risk of death or serious bodily injury, and two counts of aggravated vehicular

homicide. In order to convict a defendant of aggravated vehicular homicide, the jury is required to make additional findings in a subsequent separate proceeding. Therefore, the State presented proof on each of the above counts, except those for aggravated vehicular homicide, during the initial jury trial. After Defendant was convicted of these offenses, a separate proceeding was held and Defendant was convicted of two counts of aggravated vehicular homicide also. Prior to sentencing, the trial court merged the DUI conviction with the convictions for vehicular homicide by intoxication, and the conviction for reckless driving with the convictions for vehicular homicide by conduct creating a substantial risk of death or serious bodily injury. The latter vehicular homicide convictions were, in turn, also merged with the convictions for vehicular homicide by intoxication. Subsequent to Defendant's convictions for aggravated vehicular homicide, the trial court further merged the convictions for vehicular homicide by intoxication with these convictions, which resulted in convictions for three offenses: one count of driving while license revoked, Tenn. Code Ann. § 55-50-504, a Class B misdemeanor, and two counts of aggravated vehicular homicide, Tenn. Code Ann. § 39-13-218(a)(3), a Class A felony. Following a sentencing hearing, the trial court ordered Defendant to serve six months for the misdemeanor offense, twenty-four years for one count of aggravated vehicular homicide, and twenty-four years, six months, for the remaining count, with all sentences to be served consecutively for an effective sentence of forty-nine years.

In this appeal, Defendant argues the following: (1) the evidence was insufficient to sustain his convictions for aggravated vehicular homicide because the State failed to prove beyond a reasonable doubt that (a) Defendant's blood alcohol content was the requisite level of 0.20, or (b) that the killing of the victims was the proximate result of either Defendant's intoxication or his recklessness; (2) the trial court's instruction to the jury was erroneous for failing to properly define "proximate result"; (3) the trial court erred when it admitted the results of the blood alcohol test into evidence at trial because the State failed to establish a proper chain of custody; (4) the State's closing argument violated Rule 29.1 of Tennessee's Rules of Criminal Procedure; and (5) Defendant's sentence is excessive because the trial court improperly applied three enhancement factors and also improperly classified Defendant as a "dangerous offender."

**Factual Background**

On May 30, 1997, Defendant's vehicle was involved in a collision with another vehicle, killing the driver of that vehicle and her six-month-old infant. The accident occurred at the intersection of Houston Levy and Canada Road with Highway 64, an intersection considered "dangerous" by those familiar with the area. Highway 64 runs in an east-west direction; Houston Levy lays south of Highway 64; and Canada Road is the name given Houston Levy as it continues north after crossing the highway. The entrance from Houston Levy and Canada Road onto Highway 64 was governed by stop signs at the time of the accident involving Defendant. A stop light was installed shortly thereafter. The speed limit governing traffic on the highway approaching the intersection was 55 miles per hour.

Prior to hitting the victims' vehicle, Defendant's vehicle was observed by at least five other motorists who were also traveling west on Highway 64 and who testified at Defendant's trial. One driver was Carolyn Blackburn. Between 5:30 and 6:00 p.m. on May 30, 1997, Blackburn was

traveling west at approximately 58 to 60 miles per hour with her three daughters when she noticed Defendant's vehicle in her rear view mirror. He was "weaving in and out of the lanes, passing vehicles" and "coming up fairly fast" behind her. Highway 64 consisted of four lanes, with two lanes traveling in each direction. Since Blackburn was in the left lane when she observed Defendant, she quickly moved to the right-hand side of the highway. Blackburn testified that Defendant was driving a blue vehicle, traveling 30 to 40 miles per hour faster than she was, and nearly hit the bumper of her vehicle when he passed.

At approximately 5:30 p.m. that same day, Sam Wages was also driving west on Highway 64 when he noticed Defendant approaching "real fast" from behind him. He testified that Defendant's vehicle was moving "in and out of traffic." At that time, Wages was traveling in the left lane with another vehicle beside him on the right, so he was unable to move over. Wages alerted the other passengers in his vehicle to "hold on," because it appeared that Defendant might hit them. When Defendant caught up with the two vehicles, he passed them by driving in the left-turn lane. Wages estimated Defendant's speed to be approximately 80 miles per hour and testified that, based on the sound of the engine, Defendant was traveling as "fast as that vehicle would run." Mary Kay Thompson, a passenger in Wages' vehicle, testified that Defendant followed them for approximately ten miles with an apparently "serious" desire to pass, but the traffic was too heavy at the time. She estimated his speed at 80 to 85 miles per hour when he passed them in the turn lane.

Jon Bliahu's vehicle was traveling on the right side of Sam Wages when Defendant passed them both in the left-turn lane. Bliahu was driving at approximately 65 miles per hour and estimated Defendant's speed to be 25 to 35 miles per hour faster than his (90-100 mph). Bliahu testified that Defendant was driving "erratically." Bliahu also observed Defendant spray gravel onto Wages' vehicle as he swerved from the left-turn lane back into the left lane of the highway.

Laura McEnaney also testified that Defendant passed her vehicle prior to colliding with the victims' vehicle. Contrary to the other drivers, McEnaney did not notice Defendant until his vehicle "flew past her" and swerved back into the lane in front of her. McEnaney testified that Defendant was driving "very fast," and she watched his vehicle weave in and out of traffic until it was out of sight. She estimated that Defendant was traveling at approximately 100 miles per hour.

While Defendant was traveling west on Highway 64 and approaching its intersection with Canada Road and Houston Levy, Stephanie Kuehl and her six-month child, Zadie, were approaching the same intersection from Houston Levy. Stephanie and Zadie were on their way to a wedding rehearsal dinner for her sister, who was to be married the following day. When Stephanie reached the stop sign at Highway 64, Carolyn Cansler, a realtor, was driving the vehicle behind her and began to check the highway for oncoming traffic. At trial, Cansler testified that only a few vehicles were east-bound (approaching from the left), and they were still a fair distance away. She observed no west-bound traffic (approaching from the right) and testified that the intersection had no bushes or trees to block her view--she could see clearly in both directions. As Cansler turned her head to check traffic from the left a second time, Stephanie's vehicle started across the highway to Canada Road. Cansler's head was still facing left when she heard the vehicles collide. It was so loud, Cansler thought something had exploded. When she turned back to the scene in front of her, the

victims' vehicle was airborne. She watched it land, passenger side down, in a ravine. Defendant's vehicle came to a stop, right side up, behind the victims. Defendant exited his vehicle, climbed up a nearby hill, and sat down with his head in his hands. Cansler dialed 911. When the police arrived, they assembled on the opposite side of the road. Because she was too frightened to cross the highway, Cansler drove home without giving a statement. She contacted the police a few days later.

At trial, Daniel Evans testified that he also observed the accident. Evans' vehicle was immediately adjacent to the victims' green Saturn, waiting to make a left turn from Houston Levy onto Highway 64, heading west. Evans observed a number of vehicles coming from the east as the victims' vehicle began to cross the highway. The blue vehicle driven by Defendant was among them and traveling "very fast." Defendant was even passing a vehicle as Evans watched him near the intersection. He became concerned for the occupants of the green Saturn and recalls uttering words similar to "Oh no, don't do that" as they continued across. Evans' wife heard his comments. She looked up just in time to see the blue vehicle approaching and testified that Defendant's vehicle appeared to accelerate as it neared the intersection. The Evans watched helplessly as the blue vehicle broadsided the green Saturn, "flipping it into a ditch on the side of the road." The blue vehicle had spun 180 degrees and came to rest facing east.

Richard Leggett was driving the vehicle that Evans had watched Defendant pass on his final approach to the intersection. Leggett was traveling west at approximately 55 miles per hour in the right lane of Highway 64 at that time because he planned to turn right onto Canada Road. According to his testimony at trial, Leggett was preparing to slow down for the turn when Defendant's blue Maxima passed him and swerved back into the lane in front of him. Leggett simultaneously observed the green Saturn belonging to the victims come to a rolling stop at Houston Levy and then proceed onto the highway. Defendant hit the passenger side of the Saturn so hard that the Saturn became airborne. Leggett estimated Defendant's speed was approximately 90 miles per hour as he drove by.

Shortly after the collision, the accident scene became congested with concerned motorists and emergency service personnel. Among the first to respond were paramedics Jennifer Ridinger, Phillip Tolbert, and Amy Laveck. Ridinger was initially assigned to Defendant and noted that he was conscious, coherent, and had an unusually strong odor of alcohol on his person. When Tolbert began treatment a few minutes later, he asked Defendant various questions in order to ascertain his medical condition. Tolbert testified that Defendant answered all of his questions, but very slowly. Tolbert detected a strange smell emanating from Defendant which he believed might be alcohol, and asked whether Defendant had been drinking alcohol. Defendant replied negatively. Laveck and Tolbert loaded Defendant into the ambulance for transport to the Regional Medical Center at Memphis. On the way, Laveck attempted to check Defendant's eyes for pupil response, but Defendant would not open them. Laveck confirmed that Defendant smelled strangely--like alcohol or acetone--but could not identify the substance.

When Tolbert assumed the care of Defendant, Ridinger was reassigned to look after the infant victim, Zadie. Ridinger and her partner first immobilized her body on a small spine board to prevent further injury and than loaded her into an ambulance for transport to LeBonheur Children's

-4-

Medical Center. On the way, they established the necessary IVs and administered oxygen to keep her breathing. Zadie lapsed in and out of consciousness during the trip. Her injuries included a subdural hemotoma and subarachnoid hemorrhage, which are accumulations of blood in membranes surrounding the brain and spinal cord. Zadie was pronounced "brain dead" on the day following the accident. Cause of death was determined to be a severe head injury.

Danny Spry and Glenn Kneeland, emergency medical technicians for the Shelby County Fire Department, arrived at the accident scene and were immediately advised that one of the victims, Stephanie Kuehl, was trapped inside her vehicle. After failing in their attempt to enter through the sunroof, the men used cutters and spreaders to remove the door. When they finally reached the victim she was bluish in color, not breathing, and her pupils were fixed. Finding no pulse, Spry and Kneeland sought confirmation of death from a third paramedic and, thereafter, pronounced Stephanie Kuehl deceased. At trial, Dr. O'Brien Cleary Smith testified that Stephanie sustained the following injuries from the impact: fractures of the skull, jaw, cervical spine, pelvis, ribs, and collar bone; multiple abrasions to head, face, and chest; crushed spinal cord; and the heart was torn from the aorta, as indicated by bleeding in the left chest cavity. Dr. Smith declared the cause of death to be multiple injuries and, from the position of Stephanie's feet, he was able to further ascertain that death had occurred suddenly. Her blood tests for carbon monoxide, alcohol, and drugs were negative.

When Joe D. Gurley, a patrolman with Shelby County Sheriff's Office, arrived at the accident scene, he discovered the victims' Green Saturn lying on its side in a ditch with massive damage and a blue Maxima sitting upright facing east. Because the Tennessee Highway Patrol ("THP") has jurisdiction over highway matters, Officer Gurley assisted by securing the scene and caring for the injured until an officer from the THP arrived. At 6:20 p.m., THP Trooper Cheryl McNeary showed up and observed that one victim, Stephanie Kuehl, was trapped in a Saturn; another victim, an infant, was being attended by nurses; and Defendant was lying on his back on a nearby hill. McNeary and the other troopers took measurements, examined the vehicles involved, and sent for an accident reconstructionist. After completing the preliminary investigation at the crash site, McNeary went to the Regional Medical Center to check on Defendant's condition.

Immediately upon his arrival at the Regional Medical Center, Defendant was taken to the shock trauma unit and assigned numbers; specifically, patient number "591" and medical record number "9560178." According to the testimony of Kerry Stabe, a nurse in the shock trauma unit, standard procedure at the Medical Center is to treat all emergency trauma patients as "unknowns" upon their arrival, giving them each a patient and medical number for purposes of identification and record keeping unless the patient is transferred from another hospital. At a later time, the records department will search previous records and compare patient data so that all information regarding a specific patient is located under a single number, usually the original. The "mechanism of injury" determines whether a new patient is admitted to the shock-trauma unit, and everyone admitted with a particular mechanism of injury receives the same treatment as each other patient within that category. A person with Defendant's mechanism of injury and/or circumstances (vehicle collision involving a fatality) would receive oxygen; two peripheral IVs; x-rays of the chest, pelvis and spine; a CAT scan; a Tetanus shot; and lab tests, among other things. Lab tests include a blood chemistry profile and blood count. Kerry Lyons Stabe was working in the shock trauma unit when Defendant

was admitted and testified that he received these treatments and tests. Stabe also recalled asking Defendant questions concerning his medical history, including whether he had anything alcoholic to drink prior to the accident. Initially, Defendant told her that had not had anything alcoholic to drink. Because Stabe smelled alcohol on his person, she warned him to be honest with her because intoxicants might interfere with the medications received during treatment. Thereafter, Defendant admitted drinking "two beers."

Dr. Martin Croce, the Associate Director of the Trauma Unit, also testified regarding admission to the trauma center. He stated that when a patient's injury is the result of some sort of violent act, vehicle wreck, shooting, stabbing, fall, et cetera, the injured person is admitted to the shock trauma unit. Located at the other end of the hall is the "emergency room," which treats nontraumatic emergency conditions, such as chest pain and diabetes. One laboratory, which is located on the same floor as the emergency room and trauma facility, performs whatever tests are necessary to treat the patients in these departments. Tests related to patients in other departments are sent to a lab located elsewhere in the Medical Center. Typically, when a patient arrives at the shock trauma room, a team of resident doctors are standing by and each performs a specific function. The entire procedure is overseen by a chief resident, who was Dr. Croce in Defendant's case. When asked whether the Medical Center requires emergency personnel to document all procedures, Dr. Croce responded negatively. He testified that "in a perfect world all that would be done." However, in a trauma unit, documenting every step is simply not practical. Dr. Croce noted that Defendant's medical report form did not contain the name of the nurse or doctor who drew his blood.

Regarding blood test procedures for trauma patients, Dr. Croce testified that, typically, the physician will draw the blood and hand it to the nurse. The nurse then disperses the sample into the appropriate tubes for the various analyses. Next, the person who prepared the tubes places them together in one bag and takes the bag around the corner to the lab. Each tube is affixed with a sticker containing the individual patient's numbers and other information in the form of a sticker. The stickers are removed from a blue card which was attached to the patient when he or she was admitted to the trauma unit.

Once the sample arrives at the lab, the medical assistant logs the name and numbers into the computer, prepares the specimen for the specific tests required, and delivers the specimen to a medical technologist to conduct the test. Every specimen is accompanied by a request slip which also contains the patient's medical number. This number is checked against the computer identification number on the sample and the test results. The medical lab assistant who logged in Defendant's sample initialed the entry, "D.A.Y," which indicated that the work was done by Deborah Yates, a medical assistant employed by the laboratory. At trial, Yates testified that she matched the specimen number with the lab request and Defendant's patient number. Yates also identified her initials on Defendant's lab test report and the initials of the technician who ran the lactate and blood alcohol tests. The initials were "D.G.M.," which stands for Dowana Moore.

Dowana Moore confirmed that she worked at the Medical Center and was the medical technician who performed Defendant's blood alcohol test. Moore further testified that specimens from the shock trauma unit are handled differently than those from other departments. When a shock

trauma patient is on his or her way to the Medical Center, the laboratory personnel are notified in advance and put all other work aside, giving their work for the shock trauma unit top priority. When conducting blood alcohol tests, Moore testified that standard procedure requires the technician to first run a control group to ensure the machine is operating properly. The laboratory uses a CX7 Beckman instrument, which tests blood serum as opposed to whole blood samples. Moore testified that the machine automatically converts the serum result to a whole blood value. Once the controls are run, the technician inserts the tube containing the blood specimen into the instrument and it sends the results to the lab computer's printer. Once again, the patient's test identification numbers are matched against the patient's unknown or medical numbers. Defendant's blood alcohol level was determined to be 0.22.

Dr. Stafford, Professor of Pathology and Director of the Forensic Laboratory at the University of Tennessee at Memphis, was called to testify regarding the scientific method by which blood alcohol content is determined with the CX7 Beckman instrument. To this end, Dr. Stafford testified that, basically, the process is based on enzymatic conversion of alcohol to another chemical compound which absorbs a specific known quantity of light. Dr. Stafford confirmed that the process is widely accepted by the scientific community and also commonly used. Dr. Stafford also confirmed that the CX7 Beckman instrument tests blood serum and that the alcohol content in blood serum is typically higher that in that of whole blood by as much as 14 percent. However, the number entered into the medical charts is the value for grams of alcohol per one hundred milliliters of whole blood. Dr. Stafford admitted that he was unsure whether the instrument had the capability to convert a reading for serum blood to a whole blood result or if it was necessary to make the calculation afterward. In the event that the machine is not designed to report the value in whole blood, the mathematical conversion from a serum blood reading to whole blood is simple, requiring the operator to merely divide the serum blood result by 1.14.

Dr. Stafford further testified that, based on his training and experience, a person with a blood alcohol content ("BAC") of 0.22 would be severely impaired in various ways, including a "terribly" prolonged reaction time which might be five or six times that of normal. In addition, the intoxicated person would also experience impaired judgment in two aspects, decision-making skills and orientation with the physical world (e.g., judgment regarding speed, distance, and space); and impaired motor functions, which affects muscle control and hand/eye coordination. Generally, the abilities an intoxicated person first loses are those that he or she has learned--anything which requires mental information processing. Loss of muscle control follows, and vital functions are the last to be appreciably affected. This includes respiration, heartbeat, and so forth. When asked whether alcohol affects the probability that the alcohol-impaired person may become involved in an accident, Dr. Stafford responded that studies show the chances that a person with a BAC of 0.10 will become involved in a multi-vehicle accident are five times greater than that of a person without alcohol in his or her system. With a BAC of 0.15, the chances increase to approximately twenty-eight times that of normal. Dr. Stafford was unwilling to comment regarding the accident statistics for a person with a BAC of 0.22 because the data for a level that high was insufficient. Dr. Stafford also testified that some people appear still able to function at extremely high levels of alcohol intoxication. For example, a person may be able to drive and remain on the roadway for miles

without running into something. The ability to appear normal depends on how familiar the person is with his or her surroundings and how familiar the subject is with high BAC levels.

At approximately 8:00 p.m., Trooper McNeary arrived at the Medical Center to see Defendant and was directed to the trauma unit where she discovered Defendant lying on his back. McNeary noted a strong odor of alcohol coming from Defendant's person and that his speech was "slurred" and "mush-mouthed." In her opinion, Defendant was under the influence of some type of intoxicant, probably alcohol. McNeary summoned an officer from the DUI Unit.

Tommy Woods, with the Memphis Police Department DUI Unit, was summoned by the THP to offer a blood alcohol test to Defendant. When Woods arrived at the Medical Center, he advised Defendant on his rights under Miranda, and his consensual rights concerning the blood test. Defendant refused the test. In Woods' opinion, Defendant showed "obvious" signs of alcohol intoxication: he smelled strongly of alcohol, his speech was slurred or "thick-tongued," and he was unable to keep his eyes open.

Robin Beach, an Accident Reconstructionist employed by the Michigan State Police, was contacted by the Shelby County Prosecutor's Office to assist them in evaluating physical evidence from the scene. Beach took measurements and photographs of the collision site, prepared a scaled diagram of the scene, and created a computer animation of the accident. At trial, Beach reported the following findings and conclusions: Defendant's vehicle was traveling a minimum speed of 76 miles per hour (112 feet/second) upon impact with the victims' vehicle; the victims were traveling at approximately 17 miles per hour at impact; no pre-impact skid marks were created by Defendant's vehicle; the intersection is visible from at least 760 feet when traveling westward; if Defendant's vehicle had been traveling at 70 miles per hour, it would have missed impacting the victims' vehicle by 57 feet; if Defendant had begun to apply brakes at the point when the intersection was visible, it would have taken 4.67 seconds to stop; and the angle of impact with the victims' vehicle was 107 degrees (in other words, Defendant's vehicle was turning slightly to the right on impact). Beach also reported the margin of error regarding speed calculations was 5 miles per hour. The prosecutor's office issued a similar request for assistance to Dr. Martin Lipinski, Professor of Civil Engineering at the University of Tennessee. At trial, Dr. Lipinski confirmed that Defendant's speed was approximately 80 miles per hour at the time of impact, and the victims were traveling at approximately 17 miles per hour.

According to Joe Knipper, an employee with the Tennessee Department of Safety who was called to testify at trial, Defendant was driving with a "revoked" license on May 30, 1997.

Defendant visited with five former coworkers between the hours of 12:00 and 1:30 p.m. on May 30, 1997, and all five testified at trial that Defendant was not intoxicated at that time. Defendant's girlfriend, Tolanda Morrow, also testified that Defendant came to her home at 4:00 p.m. that day, that he was not intoxicated, and that he did not drink anything while he was there. Defendant left Morrow's house at approximately 5:00 p.m., and she received a telephone call informing her of the accident 15 to 20 minutes later. Upon her arrival at the scene of the collision,

Morrow spoke with Officer Gurley. During their conversation, she informed him that she had no knowledge whether Defendant had any alcohol to drink prior to the accident.

On May 30, 1997, Shondra Todd worked at the Amoco Store located 2.9 miles from the collision site on Highway 64. Defendant patronized the store almost every day, according to Ms. Todd. She testified at trial that between 5:00 and 5:30 on the day of the accident, Defendant came to the Amoco and purchased a fruit punch. The store also sells alcoholic beverages, but Defendant did not purchase any. Ms. Todd claimed that Defendant's behavior was not out of the ordinary. He did not stagger or smell of alcohol. Before Defendant left, he also spoke with Todd's husband, Ed, who was waiting for Shondra in the parking lot outside the store. At trial, Ed Todd testified that he noticed nothing unusual about Defendant's behavior that day--he did not slur his speech or smell of alcohol. Defendant left the Amoco at approximately 5:30 p.m.

Defendant did not testify during the first phase of his trial, after which the jury found him guilty of one count of driving while license revoked, one count of driving under the influence of an intoxicant ("DUI"), one count of reckless driving, two counts of vehicular homicide resulting from intoxication, and two counts of vehicular homicide resulting from conduct creating a substantial risk of death or serious bodily injury. During the second phase, the jury was required to further determine whether Defendant was guilty of aggravated vehicular homicide under Tennessee Code Annotated section 39-13-218. Conviction for this offense required the State to prove that Defendant had two or more prior DUI convictions, or one prior DUI conviction and 0.20 of one percent or more of alcohol in his blood at the time of the offense. To this end, the State presented testimony from Jimmy German, the Circuit Court Clerk of Fayette County, who confirmed that Defendant had two prior DUI convictions: one conviction occurred on June 18, 1996, in Shelby County and the other occurred six months later, on December 2, 1996, in Fayette County. German also testified that Defendant's second DUI was committed while on probation and with a revoked license from the Shelby County conviction. However, the crime was reduced to DUI, first offense, when Defendant pled guilty pursuant to a negotiated plea agreement. During the second phase of trial, Defendant testified and admitted to both DUI convictions. At the conclusion of the second proceeding, the jury convicted Defendant of two counts of aggravated vehicular homicide; both verdicts were based on the jury finding that Defendant had one prior DUI conviction, other than the conviction returned for the case on trial, and that Defendant was driving with a blood alcohol content of 0.20 of one percent or more at the time of the offense.

### Sentencing Hearing

At the sentencing hearing, Antonio Perry, the manager of the records department for Shelby County Division of Corrections, testified that Defendant had been sentenced to serve five weekends for a previous probation violation. May 30, 1997 would have been the final weekend in his sentence. Perry also testified that defendants whose driving privileges had been suspended or revoked were prohibited from driving to the facility.

Defendant testified at the sentencing hearing and professed remorse for killing the victims. He also claimed to have respect for human life and for the law. Although he was aware that he

should not have been driving on May 30, 1997 with a revoked license, he stated that he did not intend to hurt anyone and asked the Kuehl family to forgive him. Defendant denied that he had a problem with alcohol and claimed to drink only socially, e.g., at parties, clubs, and with his friends when they play sports. Defendant admitted that he pled guilty to his June 1996 DUI charge and that he spent two days in jail. He was then placed on probation for one year, his license was revoked, and he was required to attend a class on alcohol where he "learned that driving under the influence can kill." He further acknowledged that six months later, in Fayette County, he was arrested again on DUI charges after he lost control of his vehicle and drove off the road, landing upside down in a ditch. Defendant's girlfriend had been playing with her brakes, "teasing" him, as he followed her on a narrow country road. She did not realize how closely Defendant was following her and, ultimately, he was forced to drive into a ditch to avoid hitting her vehicle. His blood alcohol content was 0.15 at the time of that offense.

During cross-examination, Defendant admitted to purchasing a vehicle in April 1997 while his license was revoked and, in the months following (while his license was still revoked), he drove the vehicle to work and back, on shopping trips and errands, to his girlfriend's house, and to visit with friends. To comply with his weekend sentences at the penal farm, however, he obtained rides from other people.

Defendant further testified that on the day of the accident, he left work at 12:00 noon and drove to Arlington, Tennessee to see friends and former coworkers. A few hours later, he drove to his girlfriend's house, where he remained for approximately one hour before he had to leave for his last weekend at the penal farm. His girlfriend usually gave him a ride to the facility, but on May 30 she was too tired. As a result, Defendant drove himself. He left his girlfriend's house between 5:00 and 5:15 p.m.

Defendant testified that he drove approximately 60 or 65 miles per hour in his attempt to reach the penal farm and acknowledged that this was roughly 10 miles over the posted speed limit. He recalled the traffic was heavy that day and, therefore, he was particularly cautious while driving. He claimed to pay close attention to his surroundings during the trip, taking special care as he drew near the "dangerous" intersection at Houston Levy and Canada Road. He noticed a green vehicle approaching the intersection and recalled moving into the right lane, but conceded that he did not slow down. At this point, his attention was drawn to the new "Citgo" store under construction. Defendant testified that he spent a few moments musing about when the store would open. By the time his gaze returned to the road, the green vehicle was directly in front of him. Defendant testified that he did not drink any alcohol on May 30, 1997 and denied stating to Nurse Woods that he drank "two beers" earlier that same day. According to Defendant, the results of the blood alcohol test must be a mistake.

At the conclusion of the sentencing hearing, the trial court found the following enhancement factors applied: (1) the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (4) a victim of the offense was particularly vulnerable because of age; (8) the defendant had a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; (10) the defendant had

no hesitation about committing a crime when the risk to human life was high; and (16) the crime was committed under circumstances under which the potential for bodily injury to a victim was great. See Tenn. Code Ann. § 40-35-114(1), (4), (8), (10), and (16) (1997). The trial court assigned great weight to factor (1), based on Defendant's second prior DUI conviction and the fact that he admitted to driving during a substantial period of his probation with a revoked license. Factor (4) was found applicable to only the count of aggravated vehicular homicide concerning the infant victim, Zadie, due to her vulnerability because of age, and factor (8) was given great weight based on the proof that Defendant had "continually and repeatedly violated conditions of release" into the community. The court also gave factor (10) great weight based on the steady stream of witnesses who offered proof that Defendant endangered their lives while driving intoxicated at a great rate of speed on Highway 64, but found that factor (16), applicable when the potential for bodily injury was great, was entitled to very little weight because the state of the law was "in flux" regarding whether this factor is appropriate to apply based on risk to persons other than the victims. After further concluding that no mitigating factors applied in Defendant's case, the trial court sentenced Defendant to serve twenty-four years for the count of aggravated vehicular homicide involving Stephanie Kuehl, twenty-four years and six months for the offense involving Zadie Kuehl, and six months for driving while license revoked.

With regard to consecutive sentencing, the trial court found Defendant a "dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high." In making this determination, the trial court noted that Defendant had multiple DUI convictions and probation violations and that he was unable to comply with court orders prohibiting him from driving. The trial court observed that Defendant admitted to driving frequently while his license was revoked and for reasons the trial court considered "silly" or dangerous. Specifically, the trial court cited the circumstance where Defendant and his girlfriend played "dodgem vehicles" on the highway while his blood alcohol content was 0.15. The trial court found Defendant's driving at an excessive speed in an extremely intoxicated state on a busy highway evinced behavior that was "bold" and "evil," indicating "utter contempt for the laws of society [and] for the safety of the people on the highway." Accordingly, because Defendant was "out of control and endangered the entire community," the court found him a dangerous offender whose sentences should be served consecutively. The trial court also concluded that Defendant's sentence of forty-nine years reasonably related to the severity of his offenses, noting that Mr. Kuehl had lost his wife and all of his children (Stephanie Kuehl was twelve weeks pregnant at the time she was killed), and stated that the length of the sentence imposed was necessary for the safety of the public.

## ANALYSIS

### I. Sufficiency of the Evidence

Defendant contends that the evidence adduced at trial was insufficient to sustain his convictions for aggravated vehicular homicide or vehicular homicide. Specifically, Defendant argues that the State failed to prove beyond a reasonable doubt that his blood alcohol content was

the requisite level of 0.20 or that the killing of the victims was the proximate result of either Defendant's intoxication or recklessness. We disagree.

When evidentiary sufficiency is questioned on appeal, the standard of review is whether, after considering all the evidence in the light most favorable to the State, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 318-319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); Tenn. R. App. P. 13(e). In determining the sufficiency of the evidence, we will not reweigh the evidence or substitute our own inferences for those drawn by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978); Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). Instead, on appeal the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. Hall, 8 S.W.3d at 599. A guilty verdict by a jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory, effectively removing the presumption of innocence and replacing it with a presumption of guilt. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions concerning the credibility of witnesses, the weight and value of evidence, and factual issues raised by the evidence are matters to be resolved by the trier of fact, not this Court. Id. The defendant bears the burden of demonstrating that the evidence is insufficient to support his or her conviction. State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As relevant here, "aggravated vehicular homicide" is vehicular homicide, as defined in § 39-13-213(a)(2), where there was at the time of the offense twenty-hundredths of one percent (.20%), or more, by weight of alcohol in the defendant's blood and the defendant had one prior conviction for driving under the influence of an intoxicant. See Tenn. Code Ann. § 39-13-218(a)(3) (1997). Aggravated vehicular homicide is a Class A felony. Tennessee Code Annotated section 39-13-213(a)(2) defines "vehicular homicide" as "[t]he reckless killing of another by the operation of an automobile, airplane, motorboat or other motor vehicle: (1) [a]s the proximate result of conduct creating a substantial risk of death or serious bodily injury to a person; or (2) [a]s the proximate result of the driver's intoxication as set forth in § 55-10-401." Vehicular homicide is a Class C felony unless it is the proximate result of driver intoxication, in which case the offense is elevated to a Class B felony. See Tenn. Code Ann. § 39-13-213(b) (1997).

### A. Blood Alcohol Test

Because Defendant refused Officer Woods' request for a blood alcohol test, the sole evidence of Defendant's blood alcohol content was based on the result of a blood test conducted by the staff at the Regional Medical Center for purposes of Defendant's medical treatment. At trial, this evidence was admitted during testimony from the medical lab technician who performed the test. Defendant contends that this evidence cannot be relied upon to prove his guilt beyond a reasonable doubt because the technician was not qualified to testify as an expert witness. Defendant also argues that because the instrument used at the Medical Center was designed to test the levels of alcohol in blood serum, as opposed to whole blood, the serum levels reported by this instrument did not constitute evidence from which the jury could properly infer a valid whole blood test result.

In effect, Defendant's argument challenges the reliability and admissibility of the blood alcohol test evidence. We shall therefore address these two issues. According to the record, Defendant properly raised the issue of admissibility in a pre-trial motion to suppress and also objected at trial prior to the testimony of the medical lab technician who reported the result to the jury. For the reasons following, we find that the "reliability," or proper weight to be given this evidence, is a matter for the jury to determine, not this Court, and that the trial court did not err when it found Defendant's blood test results admissible.

With regard to reliability, the State presented testimony from Dowana Moore, the medical lab technician who conducted the blood alcohol test, to show that the level of alcohol in Defendant's blood was 0.22. (Proof of the level of alcohol in Defendant's blood was presented in the first phase of trial and was also used during the second phase to prove that Defendant's blood alcohol content was more than 0.20, one element of aggravated vehicular homicide.) The State also provided testimony from the manager of the medical records for the Regional Medical Center and the lab supervisor, during which both witnesses identified the medical report in issue as one prepared by the Medical Center and belonging to Defendant. In addition, the jury heard testimony from the Associate Director of the Trauma Unit in charge of Defendant's medical care, the medical lab assistant who logged Defendant's blood sample into the facility's computer, and an expert in the operation of the instrument used by the Medical Center to analyze blood serum. Although the evidence indicated that blood serum levels of alcohol are typically higher than for that of whole blood, Dr. Stafford testified that the number entered on the medical chart reveals the grams of alcohol per one hundred milliliters *of whole blood* and the level of mathematical expertise required to make the conversion is minimal. See State v. Braden, 867 S.W.2d 750, 757 (Tenn. Crim. App. 1993) (fact that the initial determination of the lab technician was based on the alcohol present in the accused's blood serum, as opposed to whole blood, went to the weight of the evidence).

In his brief, Defendant argues that inferring an actual whole blood level in excess of .20% in Defendant's blood from the above evidence "amounts to speculation, surmise, and conjecture" on the part of the jury. However, the proper weight to give any witness' testimony turns largely on his or her credibility, and questions concerning the credibility of witnesses, the weight and value of evidence, and factual issues raised by the evidence are matters properly reserved exclusively for the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). We may presume that the jury observed the witnesses at trial and evaluated their credibility accordingly. This Court will not reweigh evidence or substitute our inferences for those drawn by the triers of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Defendant is not entitled to relief on this issue.

Concerning the admissibility of Defendant's blood test result, we first observe that, according to statute, anyone who operates a motor vehicle on the roads of Tennessee is "deemed to have given consent to a test for the purpose of determining the alcoholic or drug content of that person's blood . . . ." Tenn. Code Ann. § 55-10-406(a)(1) (1997 & Supp. 2000). Notwithstanding this implied consent, a person charged with driving under the influence may refuse to submit to testing, and the tests shall not be given. See id. § 55-10-406(a)(3). An exception to this rule exists when a person is charged with aggravated assault or vehicular homicide. In that case, Tennessee Code Annotated section 55-10-406(e) provides that "[n]othing in this section shall affect the admissibility in evidence

in criminal prosecutions for aggravated assault or homicide by the use of a motor vehicle only, of any chemical analysis of the alcoholic or drug content of the defendant's blood which has been obtained by any means lawful," even when the defendant did not consent to having his blood withdrawn. See State v. Jordan, 7 S.W.3d 92, 98-99 (Tenn. Crim. App. 1999) (reiterating the four prerequisites that must be satisfied before the results of a compelled blood alcohol test are admissible); State v. Huskins, 989 S.W.2d 735, 738 (Tenn. Crim. App. 1998) (interpreting subsection 55-10-406(e) "as addressing the admissibility of otherwise lawfully obtained test results where the sample was not voluntarily taken, i.e., when the defendant refuses to submit voluntarily to testing or when the defendant is unconscious or otherwise incapable of rendering consent at the time the sample is drawn").

We are mindful that Defendant's blood was not drawn at the request of law enforcement personnel, but in accordance with procedures deemed medically necessary at the time. In State v. Ridge, 667 S.W.2d 502, 505 (Tenn. Crim. App. 1982), this Court held that Tennessee Code Annotated section 55-10-406 applies to tests conducted at the requests of law enforcement officers, rather than medical personnel. However, Ridge also clearly held that blood drawn pursuant to a medical request and analyzed for blood alcohol content may be properly admitted into evidence. Id. Moreover, in State v. Goldston, 29 S.W.3d 537 (Tenn. Crim. App. 1999), we determined that records concerning blood test results performed after the defendant's motor vehicle accident were properly admitted in a DUI prosecution under the business records exception to the hearsay rule, where the records were medical reports compiled by medical personnel, the hospital's practice was to regularly compile such reports, the defendant's blood tests were performed in the course of regularly conducted hospital activities, and each report was prepared near the time of testing and admitted through testimony of the proper records custodian. Id. at 540. Although the defendant in Goldston was charged with DUI, rather than vehicular homicide, the rationale equally applies here.

In Defendant's case, we are satisfied that the medical records were properly admitted under the business records exception to the hearsay rule. The testimony of the manager ("custodian") of the medical records for the Regional Medical Center identified the medical report in issue as part of the medical reports compiled by medical personnel with knowledge. In addition, the medical personnel who compiled the reports were under a business duty to record the blood testing procedures and the results of the tests. Further, the evidence showed that Defendant's blood tests were conducted in the course of regularly conducted hospital activities and that the results were recorded at or near the time of the testing. Consistent with Goldston, we find that hospital records kept daily for medical purposes and not prepared for the purpose of litigation are sufficiently reliable for purposes of admissibility. See id. at 542. Since the blood test results were properly admitted under the business records exception to hearsay, whether or not the technician was an "expert" does not matter. Defendant is not entitled to relief on this issue.

### B. Proximate Result

Defendant also contends that the State failed to prove beyond a reasonable doubt that the killing of the victims was the proximate result of either recklessness or intoxication on the part of Defendant.

-14-

Before ascertaining that the killing was a proximate result of either conduct or intoxication, the jury was required to determine that a reckless killing occurred. "Vehicular homicide" is defined, in relevant part, as "the reckless killing of another by the operation of an automobile, airplane, motorboat, or other motor vehicle: (1) [a]s the proximate result of conduct creating a substantial risk of death or serious bodily injury to a person; or (2) [a]s the proximate result of the driver's intoxication as set forth in § 55-10-401." Tenn. Code Ann. § 39-13-213 (1997). For purposes of applying the statute, "reckless" refers to a person who

> acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-106 (1997).

The record reveals that, immediately prior to hitting the victims' vehicle, Defendant was observed traveling at speeds estimated at 80 to 100 miles per hour by at least five other motorists and a driver who was waiting at the intersection alongside the victims. These witnesses testified that Defendant frightened motorists, passed vehicles using lanes not legal to drive in, sprayed gravel on them, came too close to their vehicles, and appeared generally out of control, dangerously weaving in and out of traffic. The accident reconstructionist not only confirmed that Defendant was speeding but, more significantly, also showed that it was unlikely Defendant even reduced his speed prior to colliding with the victims' vehicle. Lastly, Defendant admitted at trial that he was aware the intersection wherein he killed the victims was dangerous. Based on the forgoing, we conclude that the evidence was sufficient for the jury to find that Defendant acted recklessly. The testimony of the other drivers on the highway with Defendant prior to the accident proved beyond a reasonable doubt that Defendant consciously disregarded a substantial and unjustifiable risk that someone may be injured or killed if he did not exercise sufficient care. This disregard constituted a gross deviation from the standard of care that an ordinary person would exercise under the circumstances presented.

Defendant asserts that Stephanie Kuehl was negligent when she drove onto the highway in front of Defendant on May 30, 1997 and points to the testimony of Richard Leggett and Daniel Evans as proof. To briefly review, Leggett testified that Stephanie failed to come to a complete stop at the stop sign before entering highway traffic, and Evans testified that a prudent person would not have driven onto the road under the circumstances. Defendant contends that Stephanie's conduct constituted an "intervening superceding" cause which removes his responsibility for any reckless conduct, but cites no legal authority for this contention. Consequently, we find no merit in this argument. Moreover, Defendant testified that he observed Stephanie stop at the stop sign, contradicting Leggett's statement.

The jury further determined that the killings were the proximate result of Defendant's intoxication. According to the record, the proof of Defendant's intoxication was overwhelming. Dr.

Stafford's testimony, which showed the alarming effects of alcohol intoxication on a person's mental acuity, response time, muscular control, and chances of having a multi-vehicle accident, indicates that Defendant's conduct was probably due, at least in part, to intoxication. Accordingly, we find the evidence was sufficient for a jury to find that the reckless killings were the "proximate result" of Defendant's intoxication.

Since the evidence was sufficient for a rational jury to conclude that the killing was reckless and the proximate result of Defendant's intoxication, he is not entitled to relief on this issue.

## II. Jury Instructions

Defendant also contends that the trial court's instruction to the jury was erroneous for failing to properly define "proximate result." Prior to the conclusion of trial, Defendant requested that the jury be instructed on proximate *cause*, in addition to proximate *result*, so that it may consider whether the victim's behavior constituted a "superseding intervening cause." Defendant submits that the issue of superseding intervening cause was crucial to Defendant's defense, and because the trial court's refusal to instruct the jury on proximate cause left them "no legal mechanism to evaluate the actions of the victim in bringing about the accident," his conviction cannot stand. We disagree.

In refusing Defendant's request for an instruction on proximate cause, the trial judge explained that proximate cause and proximate result are legally different concepts. Ultimately, the trial court's instructions to the jury defined "proximate result" as "a result, which in the natural and continuous sequence, is a product of an act occurring or concurring with another, which, had it not happened, the result would not have occurred." This language is substantively identical to that contained in Tennessee's Pattern Jury Instruction 7.08 for vehicular homicide. See T.P.I.--Crim. § 7.08 (4th ed. 1995). It is a correct statement of the law and a proper instruction regarding "proximate result" pursuant to this Court's decision in State v. Bobby Weaver, No. 02C01-9307-CC-00143, 1995 WL 568420, Dyer County (Tenn. Crim. App., Jackson, Sept. 27, 1995) no perm. to app. filed.

In Weaver, the jury deliberated for two hours at the conclusion of trial before it returned to the courtroom requesting a definition for "proximate result." The trial judge informed the parties that he intended to charge the definition given in the pattern jury instruction relative to the civil definition for proximate result, unless anyone could give him a better one. Defendant conceded that he could not, and the Weaver trial court charged the jury with instructions identical to the instructions given in the case sub judice. Notwithstanding his concession at the time the instructions were given, the defendant in Weaver argued on appeal that the trial court had improperly instructed the jury relative to the definitions of proximate result and proximate cause under the vehicular homicide statute. Id. at *6. Defendant contended that the instructions as given were "archaic," "confusing," and failed to provide for consideration of "forseeability of the event or a break in the chain caused by independent intervening causes." Id. This Court noted that the trial court's instruction on proximate result was identical to the definition of proximate result contained in the pattern jury instructions for vehicular homicide. Id. (The opinion does not state why the trial court gave the civil definition in lieu of the criminal instruction.) We concluded that the instructions regarding the offense of vehicular homicide as given by the trial court sufficiently apprized the jury

of the effect of the existence of an independent, intervening cause and of the extent of awareness required of the defendant to constitute a culpable mental state. Id.

In criminal cases, the trial court has a duty to charge the jury on all of the law that applies to the facts of the case. State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992). Every issue of fact raised by the evidence and material to the defense must be submitted to the jury with proper instruction. State v. Odom, 928 S.W.2d 18 (Tenn. 1996). Anything short of a complete charge denies a defendant his constitutional right to trial by a jury. State v. McAfee, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987). Where existing instructions are a correct statement of the law and adequately cover the subject matter contained in a special request, compliance with the request rests within the discretion of the trial court. See State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987). Consistent with our holding in Weaver, we conclude that the trial court's instructions in this case sufficiently informed the jury of the definition of proximate result as it relates to vehicular homicide.

Lastly, we observe that the legal authority cited in Defendant's brief to support his argument fails to contain an opinion from this Court on this specific issue. In fact, the majority of the opinions cited by Defendant concern civil matters. Defendant is not entitled to relief on this issue.

### III.  Chain of Custody

Defendant contends that the State failed to establish a proper chain of custody prior to admitting the evidence concerning his blood alcohol test results. He argues that the identity and integrity of this evidence was not established and, therefore, the trial court erred when it admitted the test results at trial.

It is "well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody." State v. Holbrooks, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998); Tenn. R. Evid. 901(a). The concept of a "chain of custody" recognizes that evidence is typically handled by more than one person between the time it is obtained and the time it is analyzed and later introduced into evidence. See Ritter v. State, 462 S.W.2d 247, 249 (Tenn. Crim. App. 1970). In cases where more than one person, or "link," has had custody or control of physical evidence during this period, testimony from each person is generally necessary before it may be admitted as evidence at trial. See id. The purpose of the chain of custody requirement is to demonstrate that "there has been no tampering, loss, substitution, or mistake with respect to the evidence." State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993). Absent sufficient proof of the chain of custody, both identity and integrity of the evidence should be demonstrated by other appropriate means. Neil P. Cohen, et al., Tennessee Law of Evidence § 901[13][c] (4th ed. 2000).

It is not necessary that the State prove the identity of tangible evidence beyond all possibility of doubt, however. State v. Holloman, 835 S.W.2d 42, 46 (Tenn. Crim. App. 1992). Nor is the State required to establish facts which exclude every possibility of tampering. State v. Baldwin, 867 S.W.2d 358, 361 (Tenn. Crim. App. 1993). Instead, the evidence may be admitted when the

circumstances surrounding the evidence *reasonably* establish its identity and integrity. Id.; Holloman, 835 S.W.2d at 46. The question of whether the State has established the requisite chain of custody of a blood sample, or other similar evidence, addresses itself to the sound discretion of the trial court. State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987); State v. Johnson, 705 S.W.2d 681, 684 (Tenn. Crim. App. 1985); Wade v. State, 529 S.W.2d 739, 742 (Tenn. Crim. App. 1975). This Court will not disturb a trial court's determination regarding chain of custody absent a clearly mistaken exercise of discretion. State v. Holbrooks, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998).

In the case sub judice, the record shows that Defendant was admitted to the shock trauma unit at the Regional Medical Center because the "mechanism of injury" in his case was a vehicle collision during which a fatality occurred. According to the testimony of certain employees of the Medical Center given at trial, standard procedure for patients admitted to the shock trauma unit requires different medical personnel to quickly perform specific tasks upon the patient's initial arrival: one person starts an IV, another draws blood, and so on. Here, testimony indicated that Defendant's blood was drawn and, thereafter, a sticker imprinted with his patient number was affixed to identify the blood sample taken from him. According to Dr. Croce, whoever draws the blood typically also takes the sample around the corner to a separate laboratory which, as with all shock trauma cases, was previously notified of Defendant's arrival on May 30, 1997. Although the name of the person who drew the blood and transported the sample to the lab was not recorded, the medical assistant who received Defendant's specimen at the laboratory testified that she matched the number on the blood specimen with Defendant's identification number and then logged both numbers into the computer. The medical lab technician who tested Defendant's blood identified the medical form with Defendant's blood test results and reported that the blood alcohol was determined to be 0.22.

Under the circumstances presented here, we find that the trial court did not abuse its discretion in allowing the jury to hear evidence concerning the alcohol content of Defendant's blood. As noted above, the State is not required to prove every link in the chain beyond all possibility of doubt. Holloman, 835 S.W.2d at 46; see Braden, 867 S.W.2d at 759 (evidence admissible where the lab form failed to indicate who drew the defendant's blood but testimony indicated that an omission on the form meant the blood was drawn by the doctor); State v. Goad, 692 S.W.2d 32, 36 (Tenn. Crim. App. 1985) (failure of the police property room custodian to testify did not interrupt chain of custody and render evidence inadmissible); State v. Coury, 697 S.W.2d 373, 378 (Tenn. Crim. App. 1984) (defendant's clothing admissible even though testimony was unclear regarding which officer placed the evidence in the suitcase). Our thorough review of the record reveals that the State established all of the essential links in the chain of custody, save two, and that these links probably involve the work of a single person whose failure to record his or her name was the result of design, rather than negligence or mistake. As Dr. Croce pointed out, it is not the Medical Center's policy to require doctors and nurses to make notes during emergency treatment because it is an impractical demand in most circumstances. We agree. All of the essential links in the chain of custody save two were established, the "missing links" in this particular case are not crucial, and Defendant did not point to any specific facts which would show that the blood sample may have been altered or tampered with in any improper way. Neither did he show that the hospital deviated from its normal and customary procedure in handling the sample. Thus, we conclude that the circumstances

-18-

reasonably established the identity and integrity of the blood sample and test results. Defendant is not entitled to relief on this issue.

## IV. Closing Argument

Defendant also argues that the State violated Rule 29.1 of Tennessee's Rules of Criminal Procedure (1) by opening with a "perfunctory" argument, which failed to cover the entire scope of the State's theory as required by Rule 29.1(b), and (2) by delivering a rebuttal argument which greatly exceeded the scope of Defendant's closing argument, effectively "sandbagging" his defense. Based on these alleged errors, Defendant requested permission to make an additional argument following the State's rebuttal at the conclusion of trial. The trial court denied his request. Defendant contends that the above violations of Rule 29.1(b) by the State warranted a response from Defendant to prevent "inequity" and the trial court's refusal to let him do so was error. We disagree with both contentions.

As relevant here, Rule 29.1(b) of Tennessee's Rules of Criminal Procedure provides that "[t]he State's opening argument shall cover the entire scope of the State's theory, and the State's closing argument shall be limited to the subject matter covered in the State's opening argument and the defendant's intervening argument."

The trial court has wide discretion in controlling the argument of counsel. Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). This Court will not interfere with the exercise of that discretion absent an abuse thereof. Id. We find no such abuse here. In his brief, Defendant argues that the prosecutor exceeded the scope of Defendant's closing when (1) he suggested that Defendant's girlfriend was untruthful, (2) he claimed that the Todds may have been mistaken about the day Defendant stopped at the Amoco store, and (3) he discussed whether the victim did, in fact, stop at the intersection. However, the record reflects that these three issues were discussed during Defendant's closing argument. Thus, they are proper subject matter for further commentary by the State during rebuttal under Rule 29.1(b). Defendant's assertion that the State's rebuttal argument was longer than its opening is correct, but this violates no procedural rule. After a review of the closing arguments for both sides, we find no indication that the State impermissibly "sandbagged" Defendant's case by holding back a portion of its theory for use in rebuttal.

Courts in Tennessee have long recognized that closing arguments are a valuable privilege that should not be unduly restricted. See State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978) (citing Smith v. State, 527 S.W.2d 737 (Tenn. 1975)). Consequently, attorneys are given great leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion. Id. Because we find that the State did not impermissibly exceed the scope of Defendant's closing argument, we also find the trial court did not abuse its discretion when it refused Defendant's request to submit further argument to the jury. Defendant is not entitled to relief on this issue.

## V. Sentencing

-19-

Defendant also contends that three of the five enhancement factors applied by the trial court were inappropriate in his case and, further, that the trial court erred when it classified him as a "dangerous offender." Defendant argues that these errors resulted in a sentence of forty-nine years, which is excessive in his case. To a very limited extent, we agree.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. §§ 40-35-401(d), 402(d). The burden is on the appealing party to show that the sentencing is improper. Id. § 40-35-401, Sentencing Commission Comments. If the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). Here, the record reflects that the trial court considered the sentencing principles and all relevant evidence, but inappropriately applied two enhancement factors to Defendant's sentences for aggravated vehicular homicide. Therefore, our review is de novo with a presumption of correctness, except as to the length of Defendant's sentence for these offenses.

In conducting our review, we are required to consider the following factors in sentencing: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) the evidence and information offered by the parties on the enhancement and mitigating factors in sections 40-35-113 and 40-35-114; and (6) any statement the defendant wishes to make in his own behalf about sentencing. See Tenn. Code Ann. § 40-35-210 (1997).

If no mitigating or enhancement factors for sentencing are present, Tennessee Code Annotated section 40-35-210(c) provides that the presumptive sentence for Class A felonies is the midpoint of the range. See State v. Lavender, 967 S.W.2d 803, 806 (Tenn. 1998); Fletcher, 805 S.W.2d at 788. No particular weight for each mitigating or enhancement factor is prescribed by the statute. Instead, the weight given each factor is left to the discretion of the trial court as long as the trial court complies with the purposes and principles of the sentencing act and its findings are supported by the record. State v. Moss, 727 S.W.2d 229, 238 (Tenn. 1986); State v. Leggs, 955 S.W.2d 845, 848 (Tenn. Crim. App. 1997); see Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments.

## A. Enhancement Factors

In Defendant's case, the trial court found the following enhancement factors applicable to both of his sentences for aggravated vehicular homicide: (1) the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (8) the defendant had a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; (10) the defendant had no hesitation about committing a crime when the risk to human life was high; and (16) the crime was committed under circumstances under which the potential for bodily injury to a victim was great. See Tenn. Code

Ann. § 40-35-114(1), (8), (10), and (16) (1997). To Defendant's sentence for killing the six-month-old infant, Zadie, the trial court additionally applied enhancement factor (4), based on the fact that the child was particularly vulnerable because of her age. See id. § 40-35-114(4).

Defendant contends that factor (10) is inapplicable to sentences concerning vehicular homicide by intoxication because "this factor is addressed by the legislature's classification of the crime as a greater offense." See Tenn. Code Ann. § 39-13-213(b). Defendant cites State v. Rhodes, 917 S.W.2d 708 (Tenn. Crim. App. 1995) to support this assertion. The defendant in Rhodes was convicted of vehicular assault. In determining whether factor (10) was properly applied to the defendant's sentence for this offense, this Court observed that the statute "reflect[ed] the legislature's appreciation of the substantial risk of and actual degree of harm that results from DUI caused injury" and that the punishment provided by the statute generally addressed this concern. Id. at 714. Thereafter, we found the factor inapplicable *because the record did not indicate that any other person was actually threatened* by the defendant's driving. Id.

On the other hand, factor (10) is applicable when a high risk to human life is established by facts separate from those necessary to establish an element of the offense. State v. Bingham, 910 S.W.2d 448, 452 (Tenn. Crim. App. 1995) overruled on other grounds, State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). Such circumstances arise when a defendant creates a high risk to the life of a person other than the victim. Id.; see State v. Williamson, 919 S.W.2d 69, 83 (Tenn. Crim. App. 1995) (factor (10) applicable to sentence for vehicular homicide where defendant drove her car in an intoxicated condition on crowded highway); State v. Jerry Douglas Franklin, No. 01C01-9510-CR-00348, 1997 WL 83772 at *10, Davidson County (Tenn. Crim. App., Nashville, February 28, 1997) perm. to app. denied (Tenn. 1997) (factor (10) applicable to sentence for vehicular homicide by intoxication where other drivers placed at risk). The testimony of the five frightened drivers who shared Highway 64 with Defendant on May 30, 1997 constitutes more than sufficient proof that Defendant committed a crime when the risk to human life was high. Accordingly, we find this factor was applicable and also deserving of the "great weight" deemed appropriate by the trial court.

Defendant also contends that the trial court erred by applying factor (16) to his sentences for aggravated vehicular homicide. This factor is applicable when the crime was committed under circumstances where the potential for bodily injury to the victim was great. See Tenn. Code Ann. § 40-35-114(16) (1997). Defendant cites State v. Bingham, supra, for his contention that proof of this factor also proves an element of the charged offense. Defendant is correct. See Bingham, 910 S.W.2d at 452. Although the offense in Bingham was vehicular homicide by recklessness, it follows that a great potential for bodily injury is likewise inherent in the offense of aggravated vehicular homicide committed when the defendant's blood contains more than 0.20 percent of alcohol.

In its brief, the State responds that factor (16) is applicable based on the proof that Defendant's conduct caused a great potential of bodily injury to other motorists on the highway. Recent case decisions reveal a split of authority within this Court concerning whether factor (16) may be applied based on proof of risk created to persons other than the victim. Granted, at one time factor (16) was considered applicable, even when risk of bodily injury was an element of the offense,

under circumstances where the defendant's conduct created a risk of bodily injury to persons other than the named victim of that particular offense. See State v. Sims, 909 S.W.2d 46, 50 (Tenn. Crim. App. 1995). This holding was subsequently called into doubt by our decision in State v. Charles Justin Osborne, No. 01C01-9806-CC-00246, 1999 WL 298220 at *3 (Tenn. Crim. App., Nashville, May 12, 1999), which found that Sims had been implicitly rejected by State v. Bingham, 910 S.W.2d 448 (Tenn. Crim. App. 1995) ("Bingham . . . distinguishes between enhancement factors (10) and (16) in that factor (10) may be supported by risk to persons other than a victim of the convicted offense while factor (16) may not"). For purposes of resolving the present issue, we conclude that factor (16) is more appropriately applied when the circumstances created great potential for bodily injury to the *victim.*

Defendant also challenges the trial court's application of enhancement factor (4) to the sentence involving the infant victim. This factor is applicable when the victim of the offense was particularly vulnerable because of age or physical disability. See Tenn. Code Ann. § 40-35-114(4). Defendant argues that this factor is inappropriate because "vulnerability was not a factor in the commission of the offense" as required under State v. Butler, 900 S.W.2d 305 (Tenn. Crim. App. 1994). After a review of the facts in the record, we agree that factor (4) was improperly applied.

According to the record, the trial court applied this factor based on a finding that, "if [Zadie] had been an adult in that vehicle, she could have tried to protect her head, throw up her arms, or do something to try to keep from being killed . . . ." But, "because she was strapped in that vehicle seat and didn't see anything coming, her head was hit so hard that her brain swelled and caused her death." Thus, the trial court found "the particular vulnerability of this victim had some relation to the cause of death."

With regard to factor (4), this Court has previously stated that

[A] victim is particularly vulnerable within the meaning of this enhancement factor when the victim lacks the ability to resist the commission of the crime due to age, a physical condition, or a mental condition. A victim is also particularly vulnerable when his or her ability to summons assistance is impaired; or the victim does not have the capacity to testify against the perpetrator of the crime. However, a finding that one of these conditions exists does not, as a matter of law, mean that this factor is automatically considered. The appellant must have taken advantage of one or more of these conditions during the commission of the crime. The state had the burden of establishing the limitations that render the victim "particularly vulnerable." The state also had the burden of establishing that the condition which rendered the victim "particularly vulnerable" was a factor in the commission of the offense.

Butler, 900 S.W.2d at 313. In this case, the State failed to meet its burden of demonstrating that the victim's age was a factor *in the commission of the offense.*

Applicability of this factor was also discussed by our supreme court in State v. Poole, 945 S.W.2d 93 (Tenn. 1997), and State v. Lewis, 44 S.W.3d 501 (Tenn. 2001). In Poole, the supreme

court stated that an offense "may be committed in such a manner as to make the victim's vulnerability irrelevant." Poole, 945 S.W.2d at 97. Specifically, Poole noted that a victim's vulnerability is not a "factor in the commission of the offense" where there is no connection between the vulnerability and the crime committed. In other words, where it was apparent that "no victim, regardless of his or her physical or mental traits, could have resisted the offense committed in that manner," the victim's vulnerability was irrelevant and application of factor (4) was improper. Id.

In Lewis, the supreme court found that even though a victim's age might make the victim "vulnerable" in a general sense, the particular vulnerability may play no part in the crime. Lewis, 44 S.W.3d at 505. As such, it would not be "appropriate for the offense," as required by Tennessee Code Annotated section 40-35-114. Id. (citing Butler, 900 S.W.2d at 313 (holding advanced age of victim irrelevant when "weight lifter, football player, or any other person, male or female, who possessed adequate strength to resist a crime against the person" would have nevertheless been killed by defendant's action); State v. Seals, 735 S.W.2d 849, 853-54 (Tenn. Crim. App. 1987) (holding advanced age of victims irrelevant when crime was theft from victim's mailboxes, criminals had no contact with victims themselves, and crime would have been no different had victims been "robust athletes")).

Applying the law to the instant case, we find the infant victim's age had no bearing on, or any logical connection to, her inability to resist the crime, summon help, or testify at a later date. Because Defendant was traveling more than 76 miles per hour, it is unlikely anyone at any age could have prevented their own death from the impact that occurred. Thus, Zadie's vulnerability was irrelevant and factor (4) is inapplicable.

In conclusion, we find that the trial court's error in applying factor (16) does not necessarily call for a reduction in sentence. During its sentencing determination, the trial court noted the current flux in decisions coming from this Court with regard to factor (16) and, accordingly, found it was entitled to "not very much weight." The error concerning factor (4) is likewise relatively ineffective in reducing Defendant's overall sentence for his crime involving the infant victim. Since the record shows the trial court used factor (4) to enhance Defendant sentence only six months, we order it reduced by like amount. Given the substantial proof of defendant's criminal behavior, prior DUI convictions, unwillingness to comply with the conditions of a sentence involving release in the community, and lack of hesitation about committing a crime when the risk to human life was high, we find that twenty-four-year sentences are not excessive for the aggravated vehicular homicide offenses.

### B. Consecutive Sentencing

Lastly, Defendant argues that the trial court erred in concluding that his sentences for aggravated vehicular homicide and driving while license revoked should run consecutively for an effective sentence of forty-nine years. The trial court based this order on its determination that Defendant qualified as a "dangerous offender," see Tenn. Code Ann.§ 40-35-115(b)(4), but Defendant argues that the trial court misconstrued the criteria set forth in State v. Wilkerson, 905

S.W.2d 933 (Tenn. 1995), which must be satisfied prior to ordering consecutive sentencing on this basis.

Consecutive sentencing is controlled by Tennessee Code Annotated section 40-35-115. Under this statute, a trial court may order a defendant to serve consecutive sentences where the defendant demonstrates he is a "dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." See Tenn. Code Ann.§ 40-35-115(b)(4) (1997). In State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995), the supreme court established further limitations on orders for consecutive sentencing based upon a defendant's status as a dangerous offender. Under Wilkerson, before consecutive sentences may be imposed, the trial court must also find that the terms reasonably relate to the severity of the offenses committed and are necessary to protect the public from further serious criminal conduct by the defendant. Id. at 938.

First, we concur with the trial court's conclusion that Defendant is a "dangerous offender" whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high. See Tenn. Code Ann. § 40-35-115(b)(4) (1997). In support of this determination, the trial court made the following findings: Defendant was aware that the intersection where the collision occurred was a dangerous one; Defendant had such little regard for the legal restrictions placed upon him as a result of his prior convictions for DUI and driving while license revoked, that he continued driving while intoxicated and with a revoked license until he killed two people; Defendant actually admitted to playing games with his girlfriend and flipping his vehicle off of a narrow highway while his blood alcohol content was 0.15 during one such alcohol-related offense; Defendant violated the law and his probation repeatedly and for "silly" reasons; and Defendant exhibited conduct which was "absolutely bold and evil," in the opinion of the trial court, by driving recklessly and dangerously, in heavy traffic, on a holiday weekend while intoxicated. In summation, the trial court found that because Defendant's behavior displayed "utter contempt for the laws of society" and a "total disregard for the safety of other people," he satisfied the criteria set forth in Tennessee Code Annotated section 40-35-115(b)(4) for "dangerous offender" and his sentences should be served consecutively in order to protect the public. The court also concluded that consecutive sentences would result in a term which reasonably related to the severity of his convicted offenses.

Lastly, Defendant contends that the trial judge erroneously considered parole eligibility when he ordered consecutive sentencing. We disagree. The record reveals that the trial court's comments concerning Defendant's release eligibility were made in the context of its discussion regarding whether consecutive sentences would result in a term which reasonably related to the severity of Defendant's convicted offenses. The trial court stated that if the sentences were to run concurrently, Defendant could be eligible for parole in approximately 15 years and that this would create a "nightmare situation" during which the court would be "afraid for society." In our view, the trial court was merely pointing out that consecutive sentences were necessary to protect the public and that a sentence of forty-nine years was reasonable in light of the severity of Defendant's crimes, as required by Wilkerson. Hence, we find no error.

In sum, since we concur with the determination of the trial court that Defendant's behavior certainly indicates an attitude of little or no regard for human life, and that the sentences imposed are both reasonably related to the severity of the offenses and necessary to protect the public against further criminal conduct, we agree that consecutive sentences are appropriate. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the forgoing reasons, the judgment of the trial court is affirmed, in part, and modified, in part. Regarding Defendant's sentence for the offense of aggravated vehicular homicide involving the infant victim, we reduce the sentence from twenty-four years, six months, to twenty-four years, and remand this matter to the trial court to enter an amended judgment which reflects this modification. Defendant's effective sentence is forty-eight years and six months. We affirm the judgment of the trial court in all other aspects.

_____
THOMAS T. WOODALL, JUDGE